THE CHICAGO AND NORTHWESTERN RAILWAY COMPANY

*v.*

THE CHICAGO AND EVANSTON RAILROAD COMPANY.

*Filed at Ottawa November 17, 1884.*

1. RAILROAD CHARTER—*construed—as to right to enter a city.* A grant of power in a railroad charter "to locate, construct and maintain, and operate with horse or locomotive cars, from the city of Chicago to any point in the town of Evanston, a railroad," etc., without any express or implied restrictions, will authorize the grantee, so far as the State is concerned, to locate its tracks and fix its Chicago terminus at any point in the city, as "Chicago," simply, includes every part of Chicago.

2. EMINENT DOMAIN—*jurisdiction of Superior Court of Cook county— in proceeding for condemnation.* The Superior Court of Cook county being in law a circuit court, it follows that where a special statutory jurisdiction is conferred on the circuit court, the Superior Court will, by the same act, though not named, acquire a like jurisdiction, and *vice versa.* The Superior Court therefore has jurisdiction in applications for the condemnation of land under the Eminent Domain act.

3. SAME—*of the right to have condemnation—and how the right may be questioned.* The fact that a railway company has been organized under a valid charter, and is shown to have done corporate acts under it, is sufficient to establish a *prima facie* right to take private property under the Eminent Domain act. And this *prima facie* right can not properly be questioned in a collateral proceeding. That must be done by *quo warranto.*

4. SAME—*taking property already devoted to public use—and whether there is a change of use so as to justify the taking.* In the absence of a clearly expressed intention to the contrary, the courts will not so construe a

railway charter as to authorize one company to take the property of another already devoted to a particular public use, for the purpose of applying it to the same use. When there is no change in the use, it becomes a matter of mere private concern, without at all affecting the public interests. This rule applies only when the taking would result simply in a change of ownership, without affecting the use of the property sought to be taken.

5. The condemnation of a piece of ground for a right of way, and the construction of an abutment thereon for a bridge essential to its use as a right of way, which piece of ground had before been used by another railroad company for a wharf or dock for the receiving and discharge of freights, is not a condemnation for the same public use as that to which the property was already being applied.

6. SAME—*requiring plans and profiles of the proposed work, in order to show its character, etc.* Where land in a city is sought to be condemned for a right of way over a river upon which the land abuts, and upon which to build an abutment for a railroad bridge across the river, and the owner (another railway corporation) has other lands adjoining that sought to be taken, that may be injured more or less, depending upon the character and nature of the structure to be erected on the land sought to be condemned, it is error in the court to overrule defendant's motion to require the petitioner, before the trial is begun, to exhibit its plan and profile of its proposed railroad across the land, and to file such plans as will show to what use the petitioner designs devoting the land it seeks to condemn, and what it proposes to put upon said land, as, tracks, bridges, abutments, or otherwise.

7. SAME—*measure of damages—of the modes of showing the value of property sought to be taken.* Where property sought to be condemned for a public use has a market value, and is not devoted to any particular use, making it more valuable to the owner than to any one else, such value affords the true measure of compensation to be paid for it; but when the proof tends to show the property has no market value by reason of the particular use to which it is being applied, it is error to instruct the jury that the compensation should not be less nor more than its fair market value, and to refuse all instructions based on the theory that it has no market value.

8. Where, in the nature of things, there can be no market value of a piece of property by reason of being used in connection with and as a part of some extensive business or enterprise, its value must be determined by the uses to which it is applied. In such case, the market value of neighboring lands, differently circumstanced, may be shown, as throwing some light on the question, but it falls far short of furnishing a true or adequate test of the value of the property.

APPEAL from the Superior Court of Cook county; the Hon. SIDNEY SMITH, Judge, presiding.

On the 7th of July, 1883, the Chicago and Evanston Railroad Company filed in the Superior Court of Cook county a petition to condemn, for railroad purposes, a triangular piece of land lying on the west side of the north branch of the Chicago river, and on the north side of Kinzie street, in the city of Chicago, having an eastern front on the river of one hundred and three feet, and a southern front on Kinzie street of seventy-two and five-tenths feet. The land in question belonged to the Chicago and Northwestern Railway Company, the defendant in the petition. On the 24th of September following, the defendant filed a plea in abatement in the cause, to which the court sustained a demurrer. The defendant subsequently, on the 12th of March, 1884, filed a motion, supported by affidavits, to dismiss the petition, on the ground the petitioner had no right to take the property for the purposes set forth in the petition. This motion was overruled. On the 7th of April, 1884, the defendant filed an answer to the petition, and also a cross-petition, setting up that it owned a large amount of real estate contiguous to and in the immediate vicinity of that sought to be taken, particularly that lying immediately north of it and fronting on the Chicago river; also, that its own road, and railroad interests and business generally, would be seriously injured by the taking of that particular piece of land and using it in part for the site of a bridge to be built across the river at that place, as was proposed to be done by the petitioner. Various other matters relied on as showing the Chicago and Northwestern Railway Company would be specially injured by condemning the land for the purposes proposed, not necessary to be noticed in this statement, were offered.

The trial commenced on the 9th and ended on the 15th of April, 1884, resulting in the assessment of the damages of the Chicago and Northwestern Railway Company at $28,000, upon which final judgment was entered by the court, and the defendant appealed.

The instructions given to the jury in the case are as follows : On the court's own motion :

"In this case the jury are to determine what will be just compensation to the respondent, the Chicago and Northwestern Railway Company, for its property taken or damaged by the appropriation of the piece of land described in the petition, to be used by the petitioner for the purpose of its railroad, including the erection thereon, on a part thereof, of an abutment for a railroad bridge across the north branch of the Chicago river, and the use of this abutment in operating or swinging such bridge. Such compensation for the land actually to be taken should not be less nor more than the fair market value, on the 7th of September, of the land thus described, considered as a part of the lot 1 from which it will be taken. The jury are also to determine, from the evidence, whether, in addition to such market value, damages should be awarded to the respondent, and if so, what amount of damages. In determining the latter question, the jury should consider all the evidence relating to the extent of the respondent's entire lines of road terminating in Chicago, and its business transacted over the same, and its entire dock or wharf property, and, generally, its entire real property constituting its terminal facilities at Chicago, on the 7th day of July last. And if the jury find, from the evidence, that this piece of land proposed to be taken, in the condition in which it was on the 7th day of July last, did constitute such a material portion of such terminal facilities that by taking the same the respondent will necessarily be substantially inconvenienced and damaged in the operation of its lines of road, then the jury should award such damages therefor as the evidence in this regard shall warrant; but if the jury shall believe, from the evidence, that no such inconvenience or injury will necessarily be thus caused, then no such damage should be awarded. And in this connection the jury are instructed that

nothing should be allowed for merely imaginary or speculative damages, or for such remote or inappreciable damages as the imagination may conjure up, and which may or may not occur in the future. In considering this question of damages, the jury should also consider the evidence relating to the effect upon the wharfing rights attached to the respondent's land adjoining and extending northerly from the land described in the petition, by the building of such abutment, and its use in operating the contemplated railroad bridge. And inasmuch as the petitioner has presented in court, upon this trial, a plan of bridge as the one adopted by it, and has stipulated that the contemplated bridge shall be constructed upon such plan, the question for the jury to determine is, whether the operation of such bridge by the petitioner, in conducting its railroad business, will substantially interfere with such moorage rights, and if so, to what extent, and what amount of damages will be thus occasioned to the respondents; but if the jury shall find, from the evidence, that such operation and use of such a bridge will not materially interfere with such moorage rights, then no damages should be awarded in this respect. The jury are further instructed, that in determining these questions of compensation and damages, they should proceed upon the knowledge which they may have derived by view of the property in question, with its surroundings, together with a consideration of all the evidence, including the opinions of witnesses, which has been introduced on this trial; and though it is the duty of the jury to fairly consider and weigh such opinions, they are not bound to take them as true and correct, or to accept them as conclusive, but should exercise their own judgment, upon consideration of the whole case."

Petitioner's third instruction:

"The court further instructs you, that though the market value of the property sought to be taken is the sum that the

respondent is entitled to recover as damages for the land actually taken, (if you find, from the evidence, that such land had a market value,) still all evidence tending to establish that sum should be considered; but your inquiry should be confined to the market value of the property sought to be taken, on the 7th day of July, 1883, if you believe, from the evidence, that such land had a market value at said date. And the purposes for which such property was used before and at that date, and designed, its location and advantages as to situation, are proper matters of consideration by the jury."

Defendant's third instruction:

"And in determining the compensation to be awarded to the defendant, the jury are to consider the use and adaptability for railroad purposes of the property in controversy, whether as a part of the terminal facilities of the defendant, or otherwise, as disclosed by the evidence; and the jury may consider, for the purpose of ascertaining the capacity and adaptability of the premises for railroad uses, the nature and amount of business transacted by the defendant thereon, as well as the facilities afforded by said premises for transacting such business, now and in the future."

Mr. B. C. Cook, and Mr. Melville W. Fuller, for the appellant:

The petition must show on its face every fact necessary to the exercise of the right of eminent domain. *Smith* v. *Railroad Co.* 105 Ill. 518.

A corporation has only such powers as are expressly given, or are necessarily implied from those given. *Caldwell* v. *City of Alton*, 33 Ill. 416; *Chicago* v. *Rumpff*, 45 id. 90; *People* v. *Clerk of Board of Trustees*, 45 id. 112.

For every corporate act, authority therefor must be found in a grant or a requirement of a statute. *Webster* v. *People*, 98 Ill. 347; *Bank* v. *Godfrey*, 23 id. 602; *Thomas* v. *Railroad*

*Co.* 11 Otto, 82; *Railroad Co.* v. *Railroad Co.* 11 C. B. 775; *Railroad Co.* v. *Hawk,* 5 H. L. Cases, 331.

This rule is applied in all its rigor when an attempt is made to construe a corporate grant so as to interfere with a previous grant of the same kind. *Pennsylvania Railroad Co.'s Appeal,* 93 Pa. St. 159; 3 Am. & Eng. R. R. Cases, 507.

A charter will not be so far stretched as to allow the taking of corporate franchises, unless absolutely essential to the carrying out of the purposes which the legislature has contemplated. *Matter of City of Buffalo,* 68 N. Y. 167; *Hickock* v. *Hine,* 18 Ohio St. 92; *Matter of Ninth Avenue,* 45 N. Y. 729; *Bridgeport* v. *Railroad Co.* 36 Conn. 255; *Railroad Co.* v. *Faribault,* 23 Minn. 167; *Bridge Co.* v. *Middlesex,* 10 Pick. 270; *Railroad Co.* v. *Railroad Commissioners,* 118 Mass. 561; *The State* v. *Noyes,* 47 Maine, 189; Green's Brice's Ultra Vires, (2d Am. ed.) 377; *Rex* v. *Pease,* 4 B. & A. 30; *Regina* v. *Railroad Co.* L. R. 2 Q. B. 310; *Attorney General* v. *Railroad Co.* L. R. 4 Ch. App. 194; *Pugh* v. *Railway Co.* L. R. 12 C. A. Div. 274; *New York City* v. *Telegraph Co.* 21 Hun, 261; *The State* v. *Railroad Co.* 35 N. J. L. 328.

If the powers of the subsequent charter can by reasonable intendment be exercised without the appropriation of property actually held and used for another public use, it must be done. Mills on Eminent Domain, 46; *Railroad Co.* v. *Railroad Co.* 75 Va. 780; *Proprietors of Locks and Canals* v. *City of Lowell,* 7 Gray, 226; *Railroad Co.* v. *Railroad Co.* 35 Mich. 265; *Railway Co.* v. *Railway Co.* 81 Ill. 583; *Hatch* v. *Railroad Co.* 18 Ohio St. 119.

The court erred in refusing to require the petitioner to file a plan or specification of the bridge across the north branch of the Chicago river, as a basis for determining the compensation to be paid. *Railroad Co.* v. *Kirby,* 21 Ill. 121; *Railroad Co.* v. *Railway Co.* 105 Ill. 394.

The owner of property taken for a public use is entitled to recover its actual value, and if the property is devoted to

a special use, and for that reason has a special value to the owner, he may recover for this. *Railroad Co.* v. *Kirby*, 104 Ill. 345; *Railway Co.* v. *Railroad Co.* 100 id. 30.

The term "property" embraces every kind of valuable right or interest, and any act in relation to that property which deprives the owner of its ordinary use, is a taking, in a constitutional sense. *Rigney* v. *City of Chicago*, 102 Ill. 64; *Pumpelly* v. *Green Bay Co.* 13 Wall. 177; *Sinnickson* v. *Johnson*, 2 Harr. 129; *Cornell* v. *Newburgh*, 2 Johns. 162; *Roe* v. *Granite Bridge Co.* 21 Pick. 334; *Canal Supervisors* v. *People*, 17 Wend. 604; *Luckland* v. *Railroad Co.* 31 Mo. 180; *Stevens* v. *Middlesex Canal*, 12 Mass. 426; *Pratt* v. *Brown*, 3 Wis. 613; *Walker* v. *Shepardson*, 4 id. 511; *Fisher* v. *Horicon Iron Co.* 10 id. 353; *Newell* v. *Smith*, 15 id. 104; *Weeks* v. *City of Milwaukee*, 10 id. 242.

: The property owner is entitled to recover the value of the property, or damages, according to the situation of the property at the time when the petitioner acquires the same. The owner is entitled to any advance before the condemnation is complete, by improvements not made expressly to enhance the damages. *Railroad Co.* v. *Denman*, 10 Minn. 267; *Railroad Co.* v. *Murphy*, id. 500; *Hursh* v. *Railroad Co.* 17 id. 439; *Warren* v. *Railroad Co.* 18 id. 384; *Driver* v. *Railroad Co.* 32 Wis. 569; *Railroad Co.* v. *Hopkins*, 90 Ill. 321.

As to the proper measure of damages in this case, see *Railroad Co.* v. *Railroad Co.* 67 Ill. 147; *Jones* v. *Railroad Co.* 68 id. 386; *Railroad Co.* v. *Henry*, 79 id. 292; *Mix* v. *Railroad Co.* 67 id. 321; *Seneca Road Co.* v. *Railroad Co.* 5 Hill, 174; *Railroad Co.* v. *County of Plymouth*, 14 Gray, 155; *Railroad Co.* v. *Railroad Co.* 35 Mich. 265.

Where the property has no market value, it is to be taken *in statu quo,* and considered with reference to the use to which the owner might put it in its then condition. *Beckett* v. *Railroad Co.* L. R. 3 C. P. 82; *Railroad Co.* v. *Van Horn*, 18 Ill. 258.

Mr. E. WALKER, for the appellee :

The franchises and property of a corporation are subject to the right of eminent domain, the same as the property of natural persons.   *Railroad Co.* v. *Town of Lake*, 71 Ill. 333 ; *Railway Co.* v. *Railroad Co.* 97 id. 507 ; *East St. Louis* v. *Railroad Co.* 108 id. 265.

The petitioner corporation being a *de facto* corporation, has the right to proceed under the Eminent Domain act.

The Superior Court of Cook county is given the same powers, and placed on the same footing, as circuit courts.   *Jones* v. *Albee*, 70 Ill. 34 ; *Hall* v. *Hamilton*, 74 id. 437.

The petitioner was not bound to file plans and specifications with its petition.   It was only required to state such facts as are made necessary by the statute.   *Smith* v. *Railroad Co.* 105 Ill. 511.

Counsel also discussed at some length the instructions as to the measure of the compensation to be awarded, and the other points made by the appellant.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

The first question to be considered, and which may properly be said to have precedence of all others, is one of jurisdiction. By the second section of the Eminent Domain act, any one desiring to avail himself of its benefits is authorized to apply to the judge of the *circuit or county court*, by filing with the clerk of such court a petition, etc.   The point is now made that the petition in this case was filed in the Superior Court of Cook county,—a court which is not mentioned in the act,— and it is therefore claimed the Superior Court had no power or jurisdiction to take cognizance of the case.   Whatever force there might otherwise be in the point, this court is committed to the doctrine that the Superior Court is, in legal effect, a circuit court.   (*Jones* v. *Albee*, 70 Ill. 34 ; *Hall* v. *Hamilton*, 74 id. 437.)   It follows, therefore, where a special statutory

jurisdiction is conferred on the circuit court, as was done here, the Superior Court will, by the same act, though not named, acquire a like jurisdiction.    And so, *vice versa.*    Such being the case, of course the point is not well taken.

The next question in order is the claim that the trial court erred in not dismissing the petition, on motion.    Several reasons are assigned why the ruling of the court in the respect mentioned is erroneous, namely :    First, because the property sought to be taken was already devoted to a specific public use ; second, because the petitioner had no right or power to use the property for the purposes proposed, particularly for the purpose of building an abutment thereon for a bridge ; and third, because the petitioner had no power to enter the city, nor to operate a steam railroad within the city.    We do not think any of the reasons assigned are sufficient to have justified the court in dismissing the petition, hence there was no error in refusing to do so.

The Chicago and Evanston Railroad Company was incorporated by a special act of the legislature, on the 16th day of February, 1861.    By the second section of the act the company was authorized "to locate, construct, maintain and operate, with horse or locomotive cars, from the city of Chicago to any point in the town of Evanston, a railroad, with single or double tracks, turn-outs, sidings, depots, and all other necessary appliances."    By the fifth section the com-. pany is given the usual powers to acquire the right of way, by purchase, or by condemnation, where it can not be otherwise obtained.    There was an organization of the company, and various acts done under it, before the present constitution went into effect, though nothing done towards building the road itself before that time.    The charter expressly prohibited the company from laying down its tracks in certain specified streets of the city of Chicago, but as none of these streets are occupied, or proposed to be occupied, by its tracks, this limitation on the powers of the company is unimportant,

except so far as it may, by implication, tend to show the legislature contemplated the company would, in locating and constructing its road, enter the city. As "Chicago," simply, includes every part of Chicago, we think a legislative grant to build and operate a railway from Chicago to another given point, without any express or implied restrictions, would authorize the grantee, so far as the State is concerned, to locate its tracks and fix its terminus at any point in the city.

With respect to the claim the property in question was already devoted to a public use, and could not therefore be taken, it is submitted that we fully recognize the rule that courts, in the absence of a clearly expressed intention to the contrary, will not so construe a railway charter as to authorize one company to take the property of another, already devoted to a particular public use, for the purpose of applying it to the same use. Where there is no change in the use, it becomes a matter of mere private concern, without at all affecting the public interests. It is not to be presumed the legislature, in granting a charter to build and operate a railroad or other structure of a public character, would purposely license the grantee to thus interfere with mere private rights. This, however, is a rule of construction only to be applied in cases where the legislative intent is not manifest, and herein the judicial department of government exercises its chief control over the subject. Whether a charter which assumes to confer authority upon a company to take private property for a given purpose, conforms to the requirements of the constitution, and whether the company, in appropriating and making compensation for the property, has proceeded according to law, are questions, in case of controversy, for the courts. Subject to these limitations, the legislature has unlimited control over the subject. As the charter of appellee is not assailed on constitutional grounds, we therefore assume, without discussion, it conforms to the requirements of the constitution under which it was adopted. Nor is any question made

as to the public character of the use to which the land in controversy is sought to be applied, but the contention is, that this land is already devoted to a public use, and that as there is nothing in the charter that expressly or by necessary implication authorizes the taking of this particular piece of land, there is no authority to take it at all,—and copious extracts from adjudicated cases are cited in support of this position. An examination of these cases will show that none of them are, in their material facts, like the case in hand, and hence can have no controlling influence upon it. If the doctrine contended for exists to the extent claimed, no property belonging to a railroad company, under an ordinary charter, could be taken by another at all,—a position that no one would contend for as an abstract proposition. The rule of construction above adverted to is applicable only where the taking would result simply in a change of ownership, without affecting the use of the property sought to be taken. It is hardly necessary to observe that it does not follow because the two uses are both public, that they are, therefore, within the meaning of the rule, necessarily the same. The land sought to be taken in the present case, at the time of filing the petition had no building or structure of any kind upon it, though it was used by the appellant for the purpose of receiving and discharging freights in conducting its business by rail and river. It is true that prior to that time the appellant had contracted with various parties for the building of a brick freight-house on the premises, and the same has subsequently been built; but for the purposes of the question in hand, that is unimportant, for the use to which the property was applied before the building of the freight-house was just as much a public one as it was afterwards. The question here is, does appellee seek to take and appropriate the property to the same use to which it was applied by appellant at the time of filing the petition? We think not. As already seen, it was then used as a kind of wharf or dock

for the purpose of receiving and discharging freights, but appellee now seeks to condemn it as a part of its right of way through the city, and as the line of its proposed road leads across the Chicago river at that point, it will, of necessity, require the building of a bridge, which must be supported by an abutment on the west side of the river, built upon the lot in question. The proposed bridge, with all its supports and appurtenances, with the company's tracks laid thereon, will constitute appellee's road at that point. Surely, the condemnation of this piece of ground for a right of way, and the construction of an abutment thereon for a bridge, which is essential to its use as a right of way, can not with any degree of propriety be called taking it for the same use it had previously been applied to. The difference in the two uses, in this case, is certainly greater than where one company takes a part of another's tracks for a crossing, and the right to do this is not at all questioned by any one. The lot sought to be taken constitutes the extreme southern portion of a continuous block of ground belonging to appellant, lying on the west side of the north branch of the Chicago river, and having an eastern frontage on the river of three thousand feet. To say that this extensive block of ground, in the heart of a great commercial city like Chicago, where there is a constantly growing demand for additional railroad facilities, can not be crossed at all by any other railroad entering the city, to meet the business demands of the place, is a proposition to which we can not give our assent. The very statement of it shows its unreasonableness.

With respect to the second reason assigned why the petition should have been dismissed, namely, that the petitioner had no power to apply the property to the uses proposed, it has, in effect, been answered already. The company, as we have just seen, was organized under a valid charter, and is shown to have done corporate acts under it. That was sufficient to establish a *prima facie* right to take the property in question

for the purposes set forth in the petition, and this *prima facie* right can not be successfully assailed in a mere collateral proceeding, as is sought to be done here. Appellant's counsel cite several cases from other States as laying down a contrary rule. This is denied by counsel for appellee. As the Eminent Domain law in each State is regulated by special statutes applicable to such State alone, and as a decision of this kind may be largely controlled by the rules of practice or procedure in the State where the question arises, we do not deem it necessary to critically examine the cases referred to, with a view of determining this controversy between counsel, for whatever rule the courts may have laid down in other States in giving a construction to their own statutes, the rule as above stated has already been recognized by this court in *Peoria and Pekin Union Ry. Co.* v. *Peoria and Farmington Ry. Co.* 105 Ill. 110, and we are not inclined to depart from it. Besides, it is more in harmony with the decisions of this court on other analogous questions. Proceedings in the nature of a *quo warranto* would be the proper remedy, if it is desired to question appellee's right to exercise the corporate franchises conferred by its charter.

As to the claim petitioner had no power to enter the city, nor to operate a steam railroad within it, it is sufficient to say, that is a matter entirely between the city and appellee. The right of appellee to maintain this proceeding is purely statutory, and is wholly independent of any action the city authorities might take on the subject. Appellee is proceeding under its charter and the Eminent Domain act, and not under the ordinances of the city. *Chicago and Western Indiana Railroad Co.* v. *Dunbar et al.* 100 Ill. 110.

Before the commencement of the trial, the appellant entered and filed in the cause the following motion:

"Now comes the defendant, and on the affidavit of B. C. Cook, herewith filed, moves the court for a rule on the petitioner, the Chicago and Evanston Railroad Company, to ex-

hibit its plan and profile of its proposed railroad across the land proposed to be condemned, and to file such plans as will show to what use said petitioner designs devoting said land which it seeks to condemn, and what it proposes to put upon said land, as, tracks, bridges, abutments, or otherwise."

The affidavit in support of the motion set forth that appellant was the owner of divers pieces of land contiguous to the land sought to be taken, which would be damaged by the construction of appellee's road, and that the furnishing of such plan and profile was necessary to a proper and intelligent presentation of appellant's claim for damages; that it was impossible for appellant to determine to what extent these several tracts would be damaged, without some statement of the manner in which the road of petitioner was to be constructed, etc. The court declined to enter such rule, and overruled the motion. We have no hesitancy in holding the court erred in its ruling upon this question. The rule should, at all events, have been entered so as to have afforded appellee an opportunity to assign any good reason, if any it had, why the plan and profile in question should not be furnished. Even a casual examination of the record will demonstrate that the extent of injury to the property and business of appellant, by the appropriation of the lot sought to be taken, depended largely upon the character of the structure to be placed upon it, including the bridge crossing, and the manner of operating the bridge when completed. And if there were any doubt of the necessity of such a plan and profile, it is at once dispelled by a reference to the manner in which the examination of witnesses was conducted, with a view of getting their opinions on the question of damages. Appellant's counsel took the position that in the absence of such plan and profile they had a right to assume the structures in question would be of such a character, and be operated in such a way, as to inflict the greatest possible injury to appellant's adjacent property and business. Appellee earnestly dissented

from this position, and proceeded in its investigation upon the very reverse of that theory. The opinions of appellant's witnesses were taken, or sought to be taken, first upon one plan and then upon another, when it was patent that it was a matter of pure conjecture whether any of the plans were correct, and, as it subsequently turned out, none of them were correct. All parties, the court included, were evidently groping their way in the dark. This is manifest from some of the incidents of the trial, from which we take the following:

Mr. Cook: "We object, on the ground that they have no right, when they condemn this property for the general use which they might use it for, to limit the damages which would result from the least damaging use which could be made of the property.

The Court: "The question before the court is, what will be the necessary damage to the property north and adjoining, by the use of the pier. Now, it must be a necessary damage to the use of the pier, too, and not some speculative damage. And who is to state what kind of a bridge? Are you to dictate the kind of bridge? All we can do is this: you show what kind of a bridge they might build, and they show what kind of a bridge they might build, and then the jury will say what kind of a bridge they will build, probably. I don't know any other way to get at it."

This looks a good deal like confusion doubly confounded, all of which might have been avoided by allowing appellant's motion. This motion was in the nature of an application for a bill of particulars, which is demandable in all kinds of actions and proceedings where, by reason of the generality of the claim or charge, the adverse party is unable to know, with reasonable certainty, what he is required to meet. (1 Tidd's Practice, 1st Am. ed. 334-336.) The rule applies even to criminal proceedings, as well as civil. Wharton, in his work on Criminal Law, vol. 3, sec. 3156, says: "Whenever the indictment is so general as to give the defendant inadequate

notice of the charge he is expected to meet, the court will, on his application, require the prosecution to furnish. him a bill of particulars of the evidence intended to be relied on." The practice in this respect is founded on the clearest principles of justice, and should not be departed from in any case where the circumstances require an application of the principle. The principle, as applicable to condemnation proceedings, was first recognized by this court in *Railroad Co.* v. *Kidder*, 21 Ill. 131, which is cited with approval in *Railroad Co.* v. *Railway Co.* 105 id. 388. It is true, the direct question whether a defendant may, as a matter of right, demand specifications of the character of the improvement proposed to be made, was not presented in either of these cases; but they do hold that the petitioner has the right to introduce them on his own motion, and if this may be done, *a fortiori* the defendant has the right to demand them where they are essential to a proper understanding of the case. The fact that appellee did, after the evidence in chief was all in, file such specifications, does not at all cure the error. The only purpose they could then serve was to present to the jury a case to which appellant's evidence did not relate. In short, the manner in which the case was tried, resulting from the court's ruling on this question, was unfair to the appellant.

We are also of opinion the law in respect to the measure of damages, under the peculiar facts of this case, was not accurately laid down by the court. As general propositions, the instructions may be admitted to have been substantially correct; yet, as is not infrequently the case, the special circumstances, in our opinion, required modifications and limitations which they do not contain, and without which they were calculated to mislead. When the evidence was in, the counsel on either side asked, altogether, some thirty instructions, all of which were refused except the third instruction of appellant and also the third instruction of appellee, which were given. In lieu of the refused instructions on both sides

the court gave a general charge, consisting of a number of propositions, which, together with the two instructions just referred to, were intended to cover the whole ground. We do not think they did. In respect to the compensation to be made for the property actually taken, the court, in the instruction prepared by it, told the jury it "should not be less nor more than its fair market value" on the day the petition was filed. One of the controverted questions in the case was, whether, as a matter of fact, property circumstanced as this was, had any market value in that vicinity. We think the evidence tended to prove it had not, whatever the weight of evidence may have been on that question. And as the court had refused all instructions, with the exception above mentioned, presenting this aspect of the case, and had undertaken to instruct the jury fully with respect to their duty, it should have told them how the amount of compensation was to be determined if the proofs failed to establish a market value for property situated as that was. This the court did not do. In most cases the rule laid down by the court would be correct, but there are many instances where, if thus laid down without qualification, the rule would clearly be misleading. Indeed, in all cases where a piece of property, by reason of having been applied to a particular use, has a special value to the owner, the rule announced by the court would be improper, and if observed by the jury, would necessarily lead to an unjust result. It is claimed by appellant, and it will not be denied that the evidence tends at least to show, that this particular piece of ground constituted a part of the terminal facilities of appellant's great railway, extending thousands of miles, and consisting of numerous divisions and branches. The lot in question is at present, and for years past has been, used in transferring freight to and from the company's tracks, to the lake, and is accessible to all the divisions of appellant's road. It is also claimed by appellant, and the evidence tends to prove the fact, that no other

property in that vicinity so essential and desirable for the purposes of the company's business can be obtained if that is taken. . Now, it is manifest that by reason of the use to which this property is applied, and its connection with the company's business generally, it has a special value to the company which it does not have to any one else, and which the general market value of other property in that locality not thus circumstanced throws but little, if any, light upon, much less furnishes a rule by which to determine its value. Strictly speaking, the market value of anything is determined by what it would sell for in market in due course of business, and this is ascertained by actual sales or offers for like articles. This applies to land as well as anything else. But the term is sometimes used in a more extended sense, as including the estimation which well informed persons would put upon an article in the absence of a market value, in the strict sense of that term, and this kind of evidence is always admissible to show value. We know, as a matter of common experience, that railway companies rarely, if ever, sell out their tracks, depot grounds, or other like property, by piece-meal. At least such transactions, we apprehend, are of so rare occurrence as to afford no evidence of a market price for that kind of property. It is true, in this case proof was made of several sales of land in the vicinity of the property in question, designated by the witnesses as *dock* property; but none of the pieces mentioned as having been sold were situated as the property in dispute is. It is true, the latter, like those, is dock property, but it is something more. It is a part of a great railroad property, and is an important factor in the handling and transportation of freight, in the heart of a great city, by the company owning it. Many illustrations might be given where property evidently has no market value, but one will suffice. Take the case of a railroad crossing. The value of the part of the track taken for such crossing can not be ascertained by any reference to market values,

and if determined by the value of land taken at customary prices of land in the neighborhood, the value in most cases would be inappreciable; and yet to the company who owns the track it always has a substantial value, that well informed, intelligent railroad men would readily know how to estimate. Where, in the nature of things, there can be no market value of a piece of property, by reason of being used in connection with and as a part of some extensive business or enterprise, its value must be determined by the uses to which it is applied. While in such cases the market value of neighboring lands differently circumstanced may be looked to as throwing some light upon the question, yet that alone would fall far short of furnishing a true or adequate test of the value of the property. As was said in *Railroad Co.* v. *Kirby,* 104 Ill. 345: "The value of land consists in its fitness for use, present or future, and before it can be taken for public use the owner must have just compensation. If he has adopted a peculiar mode of using that land by which he derives profit, and he is to be deprived of that use, justice requires he should be compensated for the loss. That loss is the loss to himself. It is the value which he has, and of which he is deprived, which must be made good by compensation." Substantially the same idea is well expressed in the English case of *Beckett* v. *Midland Railway Co.* L. R. 3 C. P. 82. It was there said: "The property is to be taken in *statu quo,* and to be considered with reference to the use to which *any owner* might put it in its then condition." This statement we regard as quite accurate, and it will be observed it fully meets the case where the property sought to be taken has some special value to the owner, by reason of having adopted some particular use of it. This might happen on a farm, as well as in a city or town. For illustration: Suppose the owner of a farm concludes to go into the dairy business, and proceeds to spend several thousands of dollars on his farm in preparing stalls and sheds for his cows, and in making suitable preparations

for the handling of the milk and converting it into butter and cheese. When the farm is thoroughly fitted up for this purpose, it is very clear it would have a special value to him that it would not have to any one else, unless to some one who should want it for the same purpose. One who wanted it for mere farming purposes could afford to pay but little more for it on account of its adaptation to the dairy business; and assuming that was the only dairy farm in that locality, it is clear there could be no market value for a farm thus situated, while there might, and probably would, be a market value for farms like that adapted to farming purposes merely. Suppose, in the case we have put, a railway company having the right to locate its road across this farm, so locates its tracks as to completely destroy all the improvements that have been made in fitting it up for dairy purposes, but not at all injuring the farm otherwise. Now, is it not manifest that in such a case to limit the owner's compensation to the market value of the land taken, would be grossly unjust and inadequate? And yet, in principle, we see no difference between the case suggested and the one in hand. In condemnation cases the owner of the property taken is not required to make any pecuniary sacrifices at all. He is entitled to whatever the property is worth to him, or any one else, for any purpose to which it is adapted; but the special uses or purposes to which the property is adapted must be real,— that is, founded on facts capable of proof,—and not merely speculative or imaginary.

Again, we think the court was, at least in one respect, inconsistent in its rulings, which operated injuriously to the appellant. When, as before seen, it was asked to require the appellee to furnish a plan and profile of the bridge and crossing, it refused, telling appellant's counsel, in substance, they might assume appellee would build any kind of a bridge they pleased, and then go on and take the opinions of wit-

39—112 Ill.

nesses as to how much appellant would be damaged by building that kind of a bridge; yet when appellant attempted to proceed upon the theory suggested by the court, it was not permitted to do so. This statement is verified by numerous rulings of the court. One will suffice as an illustration: Whitman, who seems to have been a competent witness to answer the question propounded, was shown a tracing map, which appellant's counsel assumed to be a representation of the river crossing and improvement to be made by appellee, and was asked in respect to it the following question: "Having examined the tracing and the map, what, in your judgment, would be the effect upon the other contiguous property next to this little piece to be taken of a bridge constructed in the ordinary way at that point?" The court, on objection by appellee, refused to permit the question to be answered. This was clearly improper, in view of the theory upon which the court required the case to be tried.

As the present opinion has already reached an unwarrantable length, without discussing other questions presented by the record we will say in conclusion, in a general way, that upon the whole case we are of opinion the appellee shows a right to have the land in question condemned for the purposes stated, upon making due compensation, to be ascertained in the manner we have indicated. So far as results are concerned, this practically covers the whole ground. The most important questions presented by this record, and not noticed, or but partially considered in the present opinion, are fully met and considered in the case of *McCartney, Attorney General, et al.* v. *Chicago and Evanston Railroad Co. et al. post*, p. 611.

The judgment will be reversed, and the cause remanded for further proceedings in conformity with this opinion.

*Judgment reversed.*

Mr. Justice Scott: I concur in reversing the judgment in this case, for the reason I hold the Chicago and Evanston railroad is only a horse railway within the limits of the city of Chicago, and can not condemn the lands for the purposes mentioned in the petition. As respects the merits of the case, I do not now express any opinion.