# DISTRICT OF COLUMBIA COMMISSIONERS *v.* BALTIMORE & POTOMAC RAILROAD COMPANY.

APPEAL FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

Argued April 9, 1885.—Decided April 20, 1885.

The right to use the streets of Washington for any other than the ordinary use of streets must proceed from Congress.

In the absence of express authorization by Act of Congress, the Baltimore & Potomac Railroad Company has no power to lay its railroad track in or across the streets of the City of Washington.

The several acts of Congress relating to that company give it no authority to leave Maryland Avenue on its way from Ninth Street to the Long Bridge.

The act of incorporation of the Baltimore & Potomac Railroad Company by the State of Maryland confers no power upon it to use the streets of a city, as an incident of its right to run to or from such city.

Ch. 18. Rev. Stat. Dist. Columbia, General Incorporation, Class 7, concerning corporations, confers no power upon a railroad company to use the streets of Washington without obtaining the previous assent of Congress.

The appellee in this court, as plaintiff in the court below, filed its bill in equity to restrain the appellants from interfering with the laying of its track in certain streets in the City of Washington. Judgment being rendered for plaintiff, defendants appealed to this court. The facts which make the case are stated in the opinion of the court.

*Mr. Albert G. Riddle* for appellants.

*Mr. Enoch Totten* for appellee.

Mr. Justice Miller delivered the opinion of the court.

This is an appeal from the Supreme Court of the District of Columbia.

The railroad company has constructed its road from Baltimore through the District of Columbia and through the city of Washington, to the Potomac River at Long Bridge, on which it crosses that river to the Virginia side. It has done this by virtue of several acts of Congress granting the necessary authority to do so. At the Washington end of the bridge it has purchased and now owns one of the squares of the city and part of another, numbered, in the division of the city into street, squares and lots, squares 233 and 267. These squares are divided by Fourteenth Street, running north and south, and square 267, on its south side, abuts on Maryland Avenue, one of the streets of the city. At the junction of Maryland Avenue, whose course is nearly east and west, and Fourteenth Street, there is a considerable space of ground made by Water Street, which follows the bank of the river, and the other two streets, which is a public highway made by the union of all three streets at that point. The map or diagram below, copied from the record, is necessary to a clear understanding of the controversy.

The railroad company alleges that its increased traffic requires in the city of Washington additional accommodations for receiving, storing and transferring freight, and that it has purchased the two squares mentioned for that reason, and that it intends to build a freight depot on square 233, as being at once convenient for the company and more out of the way of the travel, current business and residences of the citizens than any point within reasonable distance of the line of the road. As their road is at present located lawfully on Maryland avenue, along which it touches the city end of the bridge, this allegation is probably true.

In order, however, to reach square 233 with its trains, they must depart from Maryland Avenue and cross square 267 and Fourteenth Street, which lies between the two squares, or they must make a curve from the avenue around the south end of square 267, and reach square 233 by the use of the public highway made by the junction of Maryland Avenue, Water Street,

and Fourteenth Street, and, in so doing, depart from Maryland Avenue. The company gave notice, as required by law, to appellants, who, as Commissioners of the District of Columbia, are charged with the care and protection of the streets and other

highways of the city, that it intended to construct a lateral track, which, leaving its main track on Maryland Avenue at a point near its intersection with Thirteenth Street, should cross square 267 from its east to its west side, and then crossing Fourteenth Street, would reach its projected depot on square 233. The Commissioners refused consent to this, and fearing it would be attempted without such consent, they guarded the way across the street by police force for some time.

In this condition of affairs, the railroad company filed its bill in chancery in the Supreme Court of the District of Columbia, praying an injunction against the Commissioners, to prevent them from interfering with the exercise of the right which the company claimed of laying its track across Fourteenth Street, and that court granted the injunction as prayed.

The appeal of the Commissioners from this decree brings the matter in issue before us for review. Neither the pleadings in the case, nor the relief sought by the bill, nor the decree of the court, bring into question the right of the company to purchase squares 233 and 267, nor the right to erect on either of these a warehouse for the storage of freight. Nor does the question arise of their right to locate at that place such a depot as their business requires, nor to use it as such, if they have the right of access to it by using the streets and highways of the city for that purpose. This court does not, therefore, consider those questions, because the only point raised by the record is the right of the company to lay in or across the streets of the city their railroad track, and use it as a means of transit for its locomotives and cars, without any express authorization by act of Congress, or the consent of any authority representing the city of Washington or the District of Columbia.

The assertion of the existence of such a right is, to say the least, somewhat novel. It is not known to any member of this court that any railroad company, whether its cars are propelled by steam or horse-power, has ever claimed to use the streets of an incorporated city or any part of them, without express authority from some legislative body, or the authorities of the city government. It would be a strange grant of power which, authorizing a railroad company to enter or even pass through a city, should leave to the company the selection, not only of its route into or through the city, but even the streets and highways over which its tracks should be laid, subject only to its sense of its own convenience and that of the people of the city. Nor does the decision of a court of justice, that the necessities of the company demand the use of these streets, and that the locality of the depot to which the track leads is selected with a due regard to the interests of the whole city,

make this claim of power any the less remarkable. No judicial decision is cited in favor of such propositions.

The streets of Washington are largely used by street railroad companies whose tracks occupy their surface. There are some four or five of these companies, and their cars are propelled by horse-power and not by steam. They are not only a great convenience to the citizens, but they have become almost a public necessity. But it is not believed that a foot of all these tracks over all these streets exists otherwise than by virtue of an act of Congress directing specifically and minutely where this shall be done. And no power exists in one of these corporations to lay a track, however short, anywhere else.

The railroad company now asserting this right runs its cars from the east side of the city to the west, a distance of two miles or more, through a densely populated part of the city, over a track, the location of every foot of which is prescribed with minuteness by acts of Congress. And its principal passenger depot, located several hundred yards from the main line of its road through the city, makes this deflection from that line solely by virtue of an express act of Congress, passed to enable the company to do so.

It is with these well-known facts before us, showing the care with which Congress has repeatedly exercised the power of granting, refusing and regulating the use of the streets of Washington for railroads, that we approach the examination of the statute or statutes which are supposed to grant the enlarged power claimed by the Baltimore and Potomac Company in this instance.

The first and most important of these is the act of February 5, 1867, 14 Stat. 387.

After reciting that it is represented that the Baltimore and Potomac Railroad Company, incorporated by an act of the General Assembly of Maryland, passed May 6, 1853, is desirous to construct a lateral branch from its road to the District of Columbia, it is enacted that "said company shall be, and they are hereby, authorized to extend into and within the District of Columbia, a lateral railroad, such as the said company shall construct or cause to be constructed, in a direction toward

the said District, in connection with the railroad which they are about to locate and construct from the City of Baltimore to the Potomac River, in pursuance of their said act of incorporation; and the said Baltimore and Potomac Railroad Company are hereby authorized to exercise the same powers, rights and privileges, and shall be subject to the same restrictions in the extension and construction of the said lateral railroad into and within the said District as they may exercise or are subject to, under and by intent of their said charter or act of incorporation, in the extension and construction of any railroad within the State of Maryland; and shall be entitled to the same rights, compensation, benefits, and immunities, in the. use of the said road, and in regard thereto, as are provided in their said charter, except the right to construct any lateral road or roads within the said District from the said lateral branch or road hereby authorized, it being expressly understood that the said Baltimore and Potomac Railroad Company shall have power only to construct from the said Baltimore and Potomac Railroad one lateral road within the said District to some point or terminus within the city and county of Washington, to be determined in the manner hereinafter mentioned."

Section 3 of this act, after describing the care with which the company shall construct the road across any street or other way, adds : " but the said company, in passing into the District aforesaid, and constructing the said road within the same, shall enter the city of Washington at such place, and shall pass along such public street or alley to such point or terminus within the said city, as may · be allowed by Congress, upon presentation of survey and map of proposed location of said road; *Provided* that the level of said location within the said city shall conform to the present graduation of the streets, unless Congress shall authorize a different level."·

This provision of the original act, under which the Baltimore and Potomac Railroad enters this city, has never been repealed or modified, as far as we are aware, and it fully asserts the purpose of Congress to retain in its own hands the right to the use of the streets of the city in regard to this company and its road, as it has in regard to all others.

By another act, passed March 18, 1869, 16 Stat. 1, entitled as supplementary to the one above cited, it was declared "that said company may enter the city of Washington with their said railroad, and construct the same within the limits of said city on and by whichever one of the two routes herein designated the said company may elect and determine, that is to say :

"First. Beginning at the intersection of Boundary Street and North Carolina Avenue ; thence along said North Carolina Avenue to South D Street; thence along South D Street, westwardly, to Virginia Avenue ; thence along Virginia Avenue, northwestwardly, to the intersection of South C Street and West Ninth Street ; or,

"Second. Beginning at some point on the northern shore of the Eastern Branch of the Potomac River, between South L and South M Streets; thence westwardly between said streets to the intersection of Virginia Avenue with South L and East Twelfth Streets; thence along said Virginia Avenue, northwestwardly, to South K Street; thence along said South K Street, westwardly, to South Fourth Street ; thence, by a line curving to the right, to the north bank of the canal ; and thence along the said bank of the canal, northwestwardly, to Virginia Avenue ; thence along Virginia Avenue, northwestwardly, to the intersection of South C and West Ninth Streets."

Whether this was in accordance with a map, or maps, furnished by the company we are not informed; probably it was. But this is wholly immaterial, as this supplementary statute was clearly made to *allow* the use of these streets as provided in § 3 of the original act. By another act, approved March 25, 1870, Congress authorized the company to make some changes in the line of its road between East Fourth Street and the terminus at the junction of C Street south and Ninth Street west, which change, however, is described with the same particularity as the routes above described, and by the same act the time for the completion of the road was extended.

The next act of Congress, approved June 21, 1870, 16 Stat. 161, also entitled as amendatory of the act of July 5, 1867, authorizes the company to extend its road from the terminus.

at Ninth Street, "*by way of Maryland Avenue, conforming to its grade, to the viaduct over the Potomac River at the City of Washington, known as the Long Bridge, and extend* their tracks over said bridge and connect with any railroads constructed, or that may hereafter be constructed, in the State of Virginia." The act then delivers over Long Bridge to the company for its use as a railroad bridge, with conditions requiring it to be kept in good repair, and open to free use as a public highway for all the people.

It is by virtue alone of the words of this statute, which we have cited in italics, that the road of the company is anywhere near the bridge, or near the *locus in quo* of the present controversy. It requires a larger measure of liberality in construing grants of the sovereign, and especially grants for the use of the streets of a city for a railroad, than we are accustomed to, to discover in this any authority to depart from Maryland Avenue on its way from Ninth Street to the Long Bridge.

The company having its road well under way needed a passenger depot for its business, a need much more important than its present need of an additional freight depot. It did not, however, attempt to establish one under its general powers, but made application to Congress, which authorized its construction, and in doing so described its location with great precision, and the streets along which the track must go, in departing from the right of way already granted.

This act of March 3, 1871, 16 Stat. 585, required the assent of the municipal authorities of the City of Washington for the erection of the depot, and that assent was given by a joint resolution of the board of aldermen and common council on March 9, 1871. And so necessary did the company deem the consent of Congress to this, or any other occupation of the streets or public property of the city, that it procured the passage of the act of May 21, 1872, 17 Stat. 140, ratifying the action of the city authorities in the matter, and setting out with greater detail the direction of the lateral track to the passenger depot, and the streets over which it should go.

The title to the streets of Washington is in the United States, and not in the city, or in the owners of the adjacent lots.

*Potomac Steamboat Co.* v. *Upper Potomac Steamboat Co.*, 109 U. S. 672. It is, therefore, eminently proper that the right to use them for any other than the ordinary use of streets should proceed from Congress; and when we consider the express reservation of the power of Congress to allow this use in the original grant to the company, found in the third section of that act, and the detail and precision with which every foot of the track or tracks of the road has been prescribed by Congress, and that every change which expediency required has been previously authorized by Congress, we can see no place for the assertion of any right in the company to make other tracks, or changes in location of those now existing without an act giving the consent of that body.

In the face of these statutes it is hardly necessary to look into the language of the charter of the company by the Legislature of Maryland to see if the powers thus conferred, and which are said to be adopted by the act of Congress, give this extraordinary power.

It is sufficient to say that we do not find in the Maryland charter of that company any power to use the streets of a city as an incident of its right to run to or from such city. That no such right is granted may be fairly inferred from the fact that the track of this road runs for two miles under the city of Baltimore in a tunnel built for that purpose, which must have delayed the completion of the road two or three years, and cost a large sum of money. The company certainly would not have used this expensive underground roadway if anything in its charter authorized it to use the surface streets of the city.

And if the construction which counsel place upon that charter is sound, it is very certain that Congress did not intend extending that power of the company into the District of Columbia, and part with its own control of the streets and highways of Washington City, for such a power is in conflict with the express language of the act, and with the constant practice under it.

We are referred by counsel to the Revised Statutes of the District of Columbia, ch. 18, concerning Corporations. Class 7 of that chapter, §§ 618–676, provides for the voluntary

association of individuals into corporations for building rail-
roads in the District. It grants these corporations, when
formed in compliance with the rules there prescribed, all the
usual powers of such companies organized under State statutes,
and all that are necessary to the operation of a railroad, and
the powers thus conferred are, in the main, very liberal.

There are two reasons, however, why these provisions can
give no aid to the Baltimore and Potomac Company.

1. That corporation is organized under a special statute of
the State of Maryland, and is a corporation of that State. The
act of Congress of February 5, 1867, merely authorized that
Maryland corporation *to extend its road* into the District of
Columbia, and in defining the powers which the company
should exercise in the District, it referred to and adopted, in
the main, the act of the State of Maryland granting the charter.

This was three years before the general incorporation law
was enacted by Congress, and the company has never or.
ganized under that law, or professed to be governed by it, or
asserted itself to be a corporation of the District of Columbia.
Whether it could do this or not it is unnecessary to decide; but
it is very plain that the power conferred by that act was de-
signed only for corporations organized under it, and is not
conferred on corporations created by States of the Union, gov-
erned by the laws of those States.

2. But if this were not so, and if this company could exer-
cise all the powers which that statute grants to corporations
organized under it, the statute itself shows, as all the legislation
by Congress has shown, both before and since, that that body
never intended to part with the right to designate the route of
a railroad through the city, and on what streets its track
should be located, and which streets it should use. This is
plain from one of the closing sections of the chapter of the
Revised Statutes on that subject, namely :

" Sec. 673. No railroad shall be built under the provisions of
this chapter until the *route* and *termini* of such road have
been approved by Congress."

This section of the general law for the voluntary organiza-
tion of corporations for building railroads in the District of

Columbia, expresses the same idea and the same purpose that section three of the act authorizing the Baltimore and Potomac company to enter the District does, namely, to retain in the hands of Congress the absolute control of the use of the streets of the city by any railroad company whatever.

We are of opinion that, when this company wishes to depart in any direction from the line of its present track as prescribed for it by acts of Congress, it must obtain permission to do so from that body. And that Congress, and not the court nor the company, is the judge of the expediency or the necessity of such change, and of the manner in which the public good requires it to be made and the safeguards which should accompany it.

*The decree of the Supreme Court of the District of Columbia is reversed, and the case remanded, with directions to dismiss the bill.*