CITY OF CANTON *v.* CANTON COTTON WAREHOUSE COMPANY ET AL.

1. CORPORATIONS. *Contracts. Municipalities. Police power. Evasion of.*
   Where a warehouse company contracted to furnish a railroad company water through conduits, but was without power to construct and maintain the same across the streets of the city in which the water was to be delivered, a subsequent agreement by which the railroad company, having such power, undertook to construct them, is not an illegal evasion of the police power of the city.

2. RAILROADS. *Lease. Laws 1882, p. 1023, sec. 3. Illinois Central Railroad Company.*
   The lease, executed under Laws 1882, p. 1023, sec. 3, authorizing the Illinois Central Railroad Company, a foreign corporation, to lease the Chicago, St. Louis & New Orleans Railroad Company and other domestic railroad companies, invested the lessee, the foreign company, with all the power and franchises of the lessor companies.

3 SAME. *Public road or way. Streets.*
   A railroad company having power, granted by the legislature, to cross any "public road or way" has the right to cross streets as well as country roads.

4. MUNICIPALITIES.   *Legislative power over.   Streets.*

The legislature may divest a municipality of control over its streets and authorize their use by a corporation without compensating the municipality.

5. SAME.   *Railroads.   Conduits across streets.   Right of way.*

A railroad company having the right to do all acts incidental to the maintenance of its railroad, may lay conduits under the surface of its right of way to conduct water to its buildings, although in so doing the conduits pass under the streets of a municipality.

6. SAME.   *Eminent domain.   Foreign corporation.*

A foreign railroad corporation, having the right to do all acts incidental to the maintenance of its railroad, will not be denied the right to lay conduits under its right of way across streets, because it has no right to exercise the power of eminent domain.

7. SAME.   *Temporary obstruction of street.   Nuisance.*

A temporary and partial obstruction of a street by a railroad company in laying conduits across it in its right of way is not a nuisance which can be enjoined.

FROM the chancery court of Madison county.

HON. HENRY C. CONN, Chancellor.

The city of Canton, appellant, was complainant in the court below; the Canton Cotton Warehouse Company and the Illinois Central Railroad Company, appellees, were defendants there.   From a decree in defendants' favor the complainant appealed to the supreme court.   The facts are fully stated in the opinion of the court.

*Green & Green,* for appellant.

1. The city of Canton by sec. 5, Acts 1836, p. 319, acquired police power by the words "may make all such by-laws for the good government of said towns respectively as they may deem expedient, over the streets in controversy."   *Richmond R. Co.* v. *Richmond,* 96 U. S., 521; 9 Rose's Notes, 473; 1 Dillon,

Mun. Corp., secs. 393-396; *Pittsburg Co.* v. *Hood,* 94 Fed., 621; *State* v. *Inhabitants,* 11 L. R. A., 410.

2. Where country roads become city streets they pass under the jurisdiction of the city. Elliot, Roads and Streets (ed. 1900), sec. 414. "Street, therefore, includes the surface and so much of the depth as may not unfairly be used as streets are used." *Ib.,* sec. 17; 2 Dillon, Mun. Corp., sec. 697.

3. The regulation and control of streets are governmental functions and include practically unlimited power appropriate or incidental to the beneficial use of streets by the public. 2 Dillon, Mun. Corp., sec. 688; Elliot on Roads and Streets, sec. 408.

4. Streets cannot be diverted to private use; express legislation is required to grant their use to a railroad company. *Ib.,* secs. 407, 408, and 801; *Mayor* v. *Bath,* 7 Am. & Eng. R. Cas. (N. J.), 624; 2 Smith's Mod. L. Mun. Corp., secs. 1307, 1309; *Charlottesville* v. *So. Ry. Co.,* 16 Am. & Eng. R. Cas. (N. J.), 604; 3 Elliot on Railroads, secs. 1076, 1081, 1802.

5. A water company has no power to dig in streets except by legislative authority. The laying of pipes in the street is a franchise existent only by legislative grant, or municipal grant under legislative authority. *Wheat* v. *Alexandria,* 88 Va., 742; *State ex rel* v. *Portage Water Co.,* 107 Wis., 441 (61 L. R. A., 77).

6. All franchises granted are subject to municipal police power. 2 Smith, Mod. L. Mun. Corp., sec. 1707.

7. The city is liable for injuries from excavations in streets by whomsoever made. 2 Smith, Mod. L. Mun. Corp., sec. 1310.

8. The Illinois Central Railroad Company is a foreign corporation, operating the railroad across these streets as lessee of the Chicago, St. Louis & New Orleans Railroad Company, a domestic corporation, under a lease for four hundred years, made in 1882.

(1) No connection is shown between Illinois Central Railroad Company and the charters of the Canton & Jackson Railroad Company and Mississippi Railroad Company, and their charters, and the deed by Fulton, in 1839, to Mississippi Railroad Company of a right of way over his forty-five acre tract of land "to the Livingston Road" do not evidence a grant to the Illinois Central Railroad Company or to its lessor.

(2) If the charter of the Canton & Jackson Railroad Company availed, its calls are *from Jackson to Canton,* which do not mean *through* and *across* Canton. Authority to construct from one point to another carries by implication the right to cross intervening highways (3 Elliot on Railroads, sec. 1101), but not to cross streets in the terminal named. *Ib.;* secs. 1101, 1076, 1081; *N. E. R. R. Co.* v. *Payne,* 8 Rich., 177; *Daly* v. *Georgia R. R. Co.,* 12 Am. St. Rep., 291, 292; *Inhabitants* v. *Conn. R. Co.,* 6 Cush. (Mass.), 63; *Dist. Columbia* v. *B. & O. R. R. Co.,* 114 U. S., 461.

(3) A grant to run through a town is construed most favorably to the public. *St. L. R. R. Co.* v. *Haller,* 82 Ill., 209. And one to occupy a street gives only a right of passage of such width as is necessary for construction and operation of its road. Elliot on Roads and Streets, sec. 801; 2 Dillon, sec. 720.

(4) The public easement in a highway cannot be defeated by adverse or non user. *Domestic Tel. Co.* v. *Newark,* 49 N. J. L., 346; *Ralston* v. *Weston,* 46 W. Va., 550; *Atchison Ry. Co.* v. *Gen. Elec. Ry.,* 112 Fed., 689.

(5) A grant "to operate and maintain the railroad upon Choctaw street" did not confer the right to erect and maintain water stations or hydrants on or in the street. *Chicago Ry. Co.* v. *M. E. Church,* 102 Fed., 89.

9. The averment of the bill that the only right of way acquired over the streets was by acquiesence of the city in the user is not denied by the answer. An easement arising from user can be no broader than the actual use and possession. The

use for one track would not extend to others. 2 Elliot on Railroads, sec. 401. Nor could the right to lay water mains be implied from acquiescence in the use for tracks.

10. A railroad company cannot acquire title at common law by dedication, as such dedication can be only for public use, and the property of a railroad company, though acquired for public use by eminent domain proceedings, is private property. *So. Ry. Co.* v. *Standifer,* 20 Am. & Eng. R. R. Cas. (N. J.), 154 (s.c., 20 *Ib.,* note, pp. 156, 157).

"Municipalities have no power to grant a franchise for the construction of a railroad on public streets for private use only." *Ib.,* 621. Nor can a right of way for a track for private use be condemned. *Ib.,* 620. See cases *Ib.,* 618-621.

11. The contract was a sale and delivery of water by the warehouse company for profit to the railroad company. The pipes to be laid belonged to the warehouse company, and they were to be laid by the railroad company on its right of way and across the streets so as to be conduits for delivering the water across the streets into the tank of the railroad company. The use of the pipes across the streets was to be by a private corporation for its private business. The railroad company was to exercise its franchise in opening the streets and laying the pipes, and then its functions ceased. The pipes were to be used or operated for delivery of the water across the streets under the franchise of the warehouse company. Having no franchise to lay its own pipes in the streets the warehouse company for interposition acquires substantially the right denied it by the city and the law. The nuisance is continuous. It is a fraud on the police power of the city. At best, it is like the railroad company laying a track across the streets under its franchise to cross the streets for the exclusive private use and profit of the warehouse company, and to be operated by the warehouse company under its franchise. *Hoenig* v. *Chicago Ry. Co.,* 27 Neb., 699, holds: "In other words, that as it cannot perform any of the acts named, therefore it cannot avail

itself of the services of another corporation to accomplish this result."

12. Whatever may be the franchise of Chicago, St. Louis & New Orleans Railroad Company, the lessor domestic corporation, to lay this pipe, no such franchise exists in Illinois Central Railroad Company under its lease and the constitution of this state.

(1) Being a non-resident corporation it cannot exercise any franchise under the laws of this state, not enjoyed in 1890, without, under constitution, sec. 97, subjecting itself to sec. 179, and becoming a local corporation. The power to be exercised is that of Chicago, St. Louis & New Orleans Railroad Company, under the laws of this state to lay these pipes, and which was not exercised nor sought to be exercised by the lessor corporation, but now for the first time exercised by this foreign corporation. Under sec. 197 a foreign corporation cannot be authorized "to build, operate or lease any railroad in this state;" and no grant of any right or privilege and no exemption from any burden shall be made except upon condition of becoming a local corporation. This section was aimed at the Illinois Central Railroad Company, sec. 190, that the police powers shall not be "so construed as to permit corporations to conduct their business in such manner as to infringe upon . . . the general well-being of the state." The lease does not assign the corporate franchise or that of eminent domain, but only the property and the franchise to take tolls. The lessor continues to be a "going concern," and the $400,000 rent is applied to pay 4 per cent dividends on its stock. Its officers are elected annually, and $5,000 per annum is set apart for salaries and expenses. There is no assignment of after acquired property. The lessor is to pay for all advances for improvements beyond those covenanted for with 5 per cent interest. The lessor is to exercise its franchises upon request in aid of the lease. There is no power granted to exercise the franchise of eminent domain, or to lay new lines of tracks, or

to create new servitudes on the streets of Canton or elsewhere. Under this lease the lessor domestic corporation must exercise the right of eminent domain or of placing additional servitudes. 23 Am. & Eng. Ency. Law (2d ed.), 784; *Detriche* v. *L. & N. R. R. Co.,* 13 Neb., 361; *Gottschalk* v. *same,* 14 · *Ib.,* 389; *Scott* v. *Slate,* 22 *Ib.,* 628; *Koenig* v. *C. R. & Q. R. Co.,* 27 *Ib.,* 699.

12. Upon refusal of Foot to testify before the master and for the adjudged contempt, under code § 1745, the answers should have been taken off the files. *Walker* v. *Walker,* 82 N. Y., 264; *Peel* v. *Peel,* 50 Ia., 521; *Pickett* v. *Ferguson,* 45 Ark., 191; *Gant* v. *Gant,* 10 Hamp., 465; *Hull* v. *Hull,* 77 Miss., 744. The rule in *Hovey* v. *Elliot,* 167 U. S., 409, is not consonant with our jurisprudence, code §§ 923, 1745, nor with the reason of the punishment for contempt. One who defies the authority of the court should not, while in contempt, be vouchsafed its protection against his own misconduct.

*Mayes & Harris, J. M. Dickinson, A. K. Foote,* and *J. B. Chrisman,* for appellees.

The bill in this case was for an injunction which restrained the defendants from laying a water main on the right of way of the defendant railroad company. The grievance complained of was, that this main would have to cross Franklin, Fulton, and Peace streets of the city. A map accompanies the answer of the defendants, which discloses the purpose for which the pipe was about to be laid. A connecting pipe was to be laid from the ice factory, which abuts on the railroad right of way, to the main, and one from the water tank of the railroad to the main; the first through the lot owned by the Canton Cotton Warehouse Company, and the latter through the right of way of the railroad company. No proceeding to condemn private property was contemplated, and no infringement of any right is charged, except a purpose to cross said streets at right angles under ground.

The theory of the complainant seems to be, that the lessor of the railroad company never obtained a right of way into and through the city of Canton.

That the railroad company acquired a right of way (under its lease, through the charter of the New Orleans, Jackson & Great Northern Railroad Company) to the town of Canton, which complainant construes to mean the southern boundary line of the corporation, seems not to be denied. The bill also admits that the Mississippi Central Railroad Company obtained a charter granting a right of way to build from and north of the city of Canton, which complainant construes to mean from the north boundary line of said city; but it is denied that these two companies had any rights under the charters granted them, to unite their lines, and that their consolidation under the act of the legislature, presupposes any such existing conditions; that to accomplish such result required the consent of the city, but its consent has never been given. The existing crossing of its streets by the railroad was a mere license which the city may withdraw. In other words, the contention of the city is that there was a gap in the grant of the right of way to the railroads, leaving the city with paramount authority over its territory and streets, and they cannot now be crossed without its consent.

The proposition that the railroad company has no right of way through the city of Canton, is settled by the original charter granted to the New Orleans, Jackson & Great Northern Railroad Company, approved March 11, 1852, in section 3.

"Sec. 3. Said company is hereby invested with all the rights and powers necessary for the construction, repair and maintenance of railroad through this state, and may purchase such land and material for the same as they may consider necessary," etc.

We refer in this connection, also, to the following acts of the legislature germane to the subject—to wit:

"An act to amend an act granting a right of way through the

state of Mississippi, and other privileges, to the New Orleans, Jackson & Great Northern Railroad Company. Approved February 28, 1854."

"An act to incorporate the Mississippi Central Railroad Company. Approved March 10, 1852."

"An act to extend the time for the completion of the New Orleans, Jackson & Great Northern Railroad. Approved February 9, 1860."

· "An act entitled an act to authorize the consolidation of the New Orleans, Jackson & Great Northern Railroad Company." Acts 1867 and 1873.

"An act to incorporate the Canton & Jackson Railroad Company. February 7, 1841."

"An act to incorporate the Chicago, St. Louis & New Orleans Railroad Company." Acts 1882.

"An act authorizing the lease of the Chicago, St. Louis & New Orleans Railroad to the Illinois Central Railroad Company." March 1, 1882.

The act of 1852, above, is thought to be insufficient by complainant, because it does not name an objective point on the northern boundary of the state, and does not in terms provide for crossing streets and highways. Well, what does it mean? A street is no more sacred than any other highway. Must a grant mention every public road that the railroad has to cross? It cannot go through the state without crossing a great many. "A grant through," etc., such as we have in this charter, is like the grant of Cohea to the Vicksburg & Mississippi Railroad Company before the line was located. In passing on the right of the railroad under this grant, the supreme court says: "The way granted was not fixed by the deed as to place, quantity or direction." It was, until located, a floating right, exercisable over any portion of the land within the limit of the width specified. Action was required by the company to indicate and fix the way granted. The territory of the state of Mississippi, through which the legislature granted the right of way,

stood to the state in the same relation that Cohea's tract of land stood to him. In neither case had the road at the date of the grant projected the line or selected its way as to place, quantity or direction. Until located it was a floating right, but nevertheless a complete and perfect right, exercisable over any portion of the territory named, and determined and fixed when the road selected the right of way. *V. & M. R. R. Co.* v. *Barrett,* 67 Miss., 579 ; Jones on Easements, "Unrestricted Grants," sec. 373, *et seq.*

But the legislature did not overlook the fact that the railroad would cross highways and streets. It will hardly be denied that it has the power to abolish as well as to create. Its authority over highways is paramount. Dealing directly with the subject in the charter of the Holly Springs Railroad Company, made a part of the original Mississippi Central Railroad charter, the rights and obligations under which, and to which, the consolidated company (the Chicago, St. Louis & New Orleans Company) succeeded, it said in the eleventh section :

"Whenever in the construction of the said railroad it shall be necessary to cross or intersect any established road or way, it shall be the duty of said president and directors so to construct said railroad across any road already or hereafter to be established by law, so as not to impede the passage or transportation of persons or property thereon; and when it shall be necessary to pass through land of any individual, it shall also be their duty to provide a proper wagon way across said railroad from one part of the land to another."

Independent of a chartered grant, the railroad company has acquired title by prescription. We have shown that it has used and occupied daily, without question, the present right of way for forty years. All the authorities concur that easements may be thus acquired. *Lanier* v. *Booth,* 50 Miss, 410; *Alcorn* v. *Sadler,* 71 Miss., 634; *People* v. *Kerr,* 27 N. Y., 192; 6 N.

E. Pcp., 506; Jones on Easements, 147, *et seq.*, and authorities cited.

And it is no answer to say that the public also have crossed over and through all these years, or that the party claiming the right to use the way should be the only person entitled to enjoy it, provided that the right claimed is exercised independently of others. *McKenzie* v. *Ellis,* 134 Ill., 156; Jones on Easements, 272.

In *Kent* v. *White,* 10 Pick., 138, 142, it is held that different persons may have a right of way over the same place by different titles—one by grant, another by prescription and a third by custom; each may plead his own title, and, if he proves it, it is sufficient, although he may also prove title in another in proving his own, provided the titles are not in conflict.

The second proposition—to wit, that laying this pipe is an additional servitude on the right of way which the railroad cannot impose—may be dismissed with very few words.

The legal title to the streets is not in the city. It only claimed under dedication by another as an easement. For any additional servitude imposed, only the original donor of the easement can complain. The rule that he owns everything under the earth not necessary to the enjoyment of the easement, and that it reverts to him if abandoned, is a rule without exception. *Paley* v.*Chandler,* 6 Mass., 454; *Adams* v. *Emmerson,* 6 Pick., 561; *Allen* v. *Boston,* 159 Mass., 324; *Knox* v. *New York,* 55 Barber, 404; *Jackson* v. *Hathway,* 15 John., 447; *Metropolitan St. Railway* v. *Spencer,* 120 Mo., 154; *Duberger* v. *Malony,* 9 Iowa, 450; Jones on Easements, sec. 208.

So much concerning the complainant's claim that laying the pipe is an additional servitude. It must be clear that if this were true any claim or damage resulting would not inure to the city or justify an injunction on its prayer.

But the laying of the pipe in this case is an incident to the railroad right of way. Water is as much a necessity as coal or

engines.   It is a necessity without which the easement is useless.   All authorities concur that there is an implied grant in the grant of the easement of such incidental use as is necessary to its complete enjoyment.   *Abbot* v. *Butler,* 59 N. H., 317; *Walker* v. *Pierce,* 38 Vt., 94; *Gunson* v. *Haley,* 100 Pa., 42; *Holt* v. *Sargent,* 15 Gray, 97; *Bartlett* v. *Prescott,* 41 N. H., 317; *Wells* v. *Solman,* 34 N. H., 840.

Argued orally by *Marcellus Green,* for appellant, and *Edward Mayes,* and *J. B. Chrisman,* for appellee.

TRULY, J., delivered the opinion of the court.

The parties to this litigation are (1) the city of Canton, a municipality of this state incorporated by legislative authority in 1836, and by operation of law clothed with "full jurisdiction in the matter of streets," and having power to "regulate the crossing of railways;" (2) the Canton Cotton Warehouse Company, a private corporation operating under a charter authorizing it to manufacture ice and sell water, but possessing no municipal franchise empowering it to lay pipes under the streets of the city; (3) the Illinois Central Railroad Company, a foreign corporation operating and maintaining a railroad through this state from its southern to its northern boundary by virtue of a lease from the Chicago, St. Louis & New Orleans Railroad Company.   The city was complainant below, and the other parties defendant, to a bill filed in the chancery court of Madison county.

The facts giving rise to this litigation are these:   The railroad operated and maintained by the Illinois Central Railroad Company runs through the city of Canton, traversing its streets with several tracks, and has so run for more than forty years. Canton is a division or relay station on the railroad, where a roundhouse is maintained and where the cars and engines upon its trains are changed.   In the ordinary operation of its business at that place, the railroad company consumes from

100,000 to 150,000 gallons of water daily. To procure the needful supply, it has several wells on its property, but the wells frequently failed, whereupon water was obtained from the municipal waterworks at twenty-five cents per 1,000 gallons by agreement and consent of the city authorities, or the engines were taken to other points where the necessary water could be procured. The result of this was that, if an engine had to be taken elsewhere for water, it entailed considerable inconvenience and delay, while, if the water was obtained from the city, there constantly arose disputes as to the amount consumed. The power house of the Canton Cotton Warehouse Company, where it conducted its business of manufacturing ice, was adjoining the right of way of the railroad, about 1,700 feet north of the roundhouse where the railroad water tanks were maintained. In the prosecution of its business of manufacturing ice, the warehouse company wasted and was compelled to drain off its premises more water each day than was needed by the railroad for the running of its locomotives and other incidental uses. This condition of affairs brought about negotiations between the parties which resulted in a contract being entered into between the warehouse company and the railroad company, as follows: The warehouse company agreed to furnish and lay a four-inch water pipe from its pumping station to the tanks of the railroad company, and to connect with said pipe two first-class meters, to determine the amount of water consumed by the rairoad company; the railroad company agreeing to pay three cents per 1,000 gallons furnished; the contract to last five years from date. Before the pipes were laid according to the terms of this contract, it was discovered that the warehouse company had no franchise empowering it to lay pipes in or across the public streets; and it was further seen that in laying the water main it would be necessary for it to cross two of the public streets of the city—namely, Peace and Fulton streets—across both of which the railroad maintained, and had maintained for many years, its cross-

ing. Acting upon legal advice, to avoid a conflict with the municipal authorities over the legality of their action, this contract was abandoned, and subsequently another entered into, whereby for the same price per 1,000 gallons, the warehouse company contracted to furnish the water, but the railroad company agreed to furnish and lay the requisite pipe. For purposes of convenience, a six-inch main was substituted for the four-inch as stipulated in the original contract. In pursuance of this contract the railroad company undertook to lay the water main from the pump station of the warehouse company into the right of way of the railroad company, and thence south on said right of way to its own water tanks, when it was prevented by an injunction issued on behalf of the city. The grounds upon which the city prayed for and obtained the issuance of the injunction restraining the prosecution of this work were: (1) That this was a collusive and evasive scheme between the warehouse company and the railroad company, whereby it was sought to evade the police power of the city and afford the warehouse company an opportunity to further its private business by the sale of its water. (2) That the Illinois Central Railroad Company simply owned a leasehold estate in the railroad which it operated, and that it had no right to exercise the right of eminent domain under the terms of its lease, and that the laying of this water main necessitated the exercise of this power, because it constituted the establishment of a new servitude on highways, and it was further said, in this same connection, that the railroad lessor had no right of way through the city of Canton, and its tracks had been laid and were maintained simply by acquiescence on the part of the municipal authorities. (3) That in the prosecution of this work it would be necessary to dig a trench across the public streets mentioned, in order to install the water main, and that the digging of this trench, and the necessary reopening of the trench whenever repairs were needed, would constitute a continuous nuisance, and an unauthorized taking of public prop-

erty for private purposes, and would inflict irreparable damage to public and city, for which there existed no adequate remedy at law.

To determine the question of whether or not the arrangement between the railroad company and the warehouse company was evasive or collusive, we need only look at the attendant circumstances, in order to ascertain that the contract was based upon strict business principles. Here was one corporation having a product to sell, and another corporation whose needs demanded that product; the one being clothed with power to sell, and the other being vested with power to buy. The record discloses that the contract was to the mutual advantage of the parties. The warehouse company was seeking to dispose of a waste or by-product at an advantage; the railroad company was procuring a needed supply of water, of a better quality, more suitable for its use, more conveniently obtained, and at less cost than it could be otherwise procured. The purpose of the contract was legitimate, and contravened no principle of law or morals. The fact that under its provisions the railroad company procured water cheaper than the municipal authorities would supply the private citizen in no wise affects the legality of the transaction. The railroad officials had the right to buy where they could procure the needed supply of water cheapest, and their action was based on good business principles, and was strictly in accordance with their duty to the stockholders of the company. Both parties to the contract were within their legal rights, and so there was nothing to conceal, and no necessity for collusion or evasion. Nor can any sinister motive be attributed to their action in the abandonment of the original contract, and entering into another by which the railroad company was to furnish and lay the water main. It is manifest that this change in the terms of the contract was due to the fact of the discovery that the warehouse company possessed no municipal franchise vesting it with power to construct water mains across the public streets, but,

this fact being proven, it nevertheless remains true that the
purpose of the contract, the object in view, the end which both
parties sought to attain, was strictly legal. The railroad com-
pany wanted the water; the warehouse company wanted to
sell it. The seller had no authority to lay the delivery pipes.
It was thought the buyer had. So the buyer assumed the ex-
pense entailed by the construction of the requisite water main.
This was not a violation of the law, but a commendable effort
to keep within its pale; to prevent friction between the con-
tracting parties, on the one hand, and the municipal authorities,
on the other; and to still carry into effect in a perfectly legal
way the contract which was for their mutual pecuniary benefit.
Assuming the power of the railroad company to lay water mains
for its own private purposes on its own right of way, it must
be conceded that, if the mains were not intended to cross the
public streets, the contract in question would be above suspi-
cion, and the warehouse company could, with the consent of the
railroad company, have laid the main. along its right of way.
The change in the contract was in no sense an attempt to evade
the police power of the city. If the Illinois Central Railroad
Company had the power to construct and maintain water mains
along its right of way and across the public streets, it had like
power to contract with others to do the work. And this brings
us to the consideration of the material inquiry presented by
this record.

Has a railroad company the right to construct water mains
along its right of way, and, if so, has it the like power to
construct such mains over the public streets of a municipality?
But first, and as preliminary to this question in the instant
case, the attitude of the Illinois Central Railroad Company
must be considered. It is contended by appellant that this
company, being a foreign corporation, is not vested with any
power to exercise the right of eminent domain in this state, and
that the laying of the water main on its right of way is the im-
position of an additional servitude, and hence calls for the

exercise of the power of eminent domain before such main can lawfully be constructed. It is said further that, conceding, as an abstract question, that railroad companies owning their rights of way have the power to construct water mains for the purpose of procuring a needed supply of water, still in the instant case the Illinois Central Railroad Company is not vested with like power, for the reason it is the lessee only of the railroad which it operates, and is only clothed with the power and rights granted by the terms of its lease; and still further it is contended that its lessor never had a legally acquired right of way through the city and across the streets of Canton, and that the construction of its tracks and the subsequent maintenance thereof are solely due to the acquiescence of the citizens and the municipal authorities of said city. The consideration of these contentions requires a proper understanding of the underlying facts, and this renders indispensably necessary a brief examination of the laws to which the presence of the Illinois Central Railroad in this state is to be attributed. The Illinois Central Railroad Company in the year 1882, being first thereunto duly empowered by the legislative authority of the state (Laws 1882, p. 1023, ch. 559), entered into a contract of lease for the term of four hundred years with the Chicago, St. Louis & New Orleans Railroad Company. By virtue of this lease the lessor company leased, granted, and demised unto the Illinois Central Railroad Company its railroad, "extending from the city of New Orleans, in the state of Louisiana, through the states of Louisiana, Mississippi, Tennessee, and Kentucky, to a point on the south bank of the Ohio river," including all rights of way, depot buildings and grounds, and all other property, with the appurtenances thereunto belonging, and containing this further delegation of power: It (the Illinois Central Railroad Company) was expressly granted the power "to have, hold, exercise, and enjoy all the rights, powers, privileges, and franchises which can be lawfully exercised and enjoyed in or about the said railroad and other demised premises, and the manage-

ment, control, and operation of the same, as fully, amply, and entirely as the same might or could have been held, exercised, or enjoyed by the said party of the first part [the Chicago, St. Louis & New Orleans Railroad Company], had this indenture not been made." This operated as a full and complete investiture in the Illinois Central Railroad Company of all the rights, powers, privileges, and franchises which its lessor held, enjoyed, or possessed. What were those rights, and what property did the lessee enter into possession of under this lease? The Chicago, St. Louis & New Orleans Railroad Company was the result of several preceding consolidations between other and different railroad corporations. Its immediate predecessors were the Central Mississippi Railroad Company and the New Orleans, Jackson & Northern Railroad Company, and by the supplementary act ratifying the consolidation of these two companies into the Chicago, St. Louis & New Orleans Railroad Company, and incorporating the last-named company, the said Chicago, St. Louis & New Orleans Railroad Company was expressly declared to be a corporation of the state of Mississippi, and, as such domestic corporation, was "invested with all the rights, powers, privileges, liberties, and franchises conferred by the act to which this is a supplement, and especially the rights and powers of section 10 of the act to insure the construction and completion of the New Orleans, Jackson & Great Northern Railroad Company through the state of Mississippi, and of section 10 of the act incorporating the Mississippi Central Railroad Company." Referring to the acts of incorporation of the several companies, from the consolidation of which the Chicago, St. Louis & New Orleans Railroad Company resulted, and to which by each successive act of incorporation or consolidation the rights, privileges, and franchises of such companies were expressly granted, we find that the existence of a continuous line of railroad from the southern boundary of the state, thence north through the state, is expressly recognized, and its existence and enjoyment of franchises acquiesced

in and continued. We find further, as bearing on this question, and showing the privileges, powers, and franchises granted by legislative act of this state, and all of which are expressly kept alive, and finally invested in the Chicago, St. Louis & New Orleans Railroad Company, the following, arranged without reference to chronology:

"An act to authorize the consolidation of the New Orleans, Jackson & Great Northern and the Mississippi Central Railroad Companies, and for other purposes. Approved April 18, 1873 [Laws 1873, p. 567, ch. 295].

"Whereas, the New Orleans, Jackson & Great Northern Railroad Company owns a line of railroad from New Orleans, Louisiana, to Canton, Mississippi, and the line thence northward to Jackson, Tennessee, is owned by the Mississippi Central Railroad Company, but now leased to the Southern Railroad Association, a corporate body existing under the laws of this state, and this line the parties concerned are now rapidly extending to Cairo, Illinois, so that a continuous line of railroad shall be formed from New Orleans to St. Louis, Chicago, and all the railroads leading to the Atlantic seaboard and the Pacific coast, and looking to this end said parties have already entered into a contract with the Illinois Central Railroad Company."

Section 3 of an act entitled "An act granting the right of way through the state of Mississippi, and other privileges, to the New Orleans, Jackson & Great Northern Railroad Company:" "Sec. 3. Be it further enacted, that said company are hereby invested with all rights and powers necessary for the construction, repair and maintenance of said railroad through this state, and may purchase such lands and materials for the same as they may consider necessary; and in case they or their agents cannot agree with any owner or owners of land or other material, upon the terms of purchase, or in case the owner shall be under the age of twenty-one years, or a non-resident of

the state, *feme covert*, or *non compos mentis*, said company may proceed to obtain title to said lands and materials as in the manner prescribed, and shall be invested with all the powers conferred by the sixth, seventh, and eighth sections of an act to incorporate the Hernando Railroad Company, approved May 13, 1837, so far as the same may be applicable to the construction of a railroad through this state from New Orleans to the line of boundary separating it from the states of Alabama and Tennessee."

Section 2 of an act entitled "An act to incorporate the Canton & Jackson Railroad Company:" "Sec. 2.  Be it further enacted, That the president, directors and company shall have power and authority to build and construct said railroad with one or more tracks or railways from Jackson, in Hinds county, to Canton, in Madison county; and they and their agents, engineers or workmen may enter upon and use or excavate or embank any land which may be needed for the site of said railroad, or for the erection of any warehouses, depots, offices, or any other buildings or works necessary or useful in the construction of said road, and may take and use any land, timber, gravel, stone, or other materials necessary for the construction of said road, or its works, or to build, erect and repair bridges, culverts, dams, or other things necessary for the same."

Section 13 of the same act: "Sec. 13.  Be it further enacted, That whenever, in the construction of said railroad, it shall become necessary to cross or intersect a public road or highway, it shall be the duty of said president and directors so to construct said road across such public road or highway as not to impede the progress or transportation of persons or property along the same, or when it shall be necessary to pass through the lands of any person it shall also be their duty to provide for such person proper ways to cross said railroad from one part of his land to another."

Section 2 of an act entitled "An act to incorporate the New Orleans & Jackson Railroad Company and for other purposes:"

"Sec. 2. Be it further enacted, That whenever, in the construction of said road, it shall be necessary to cross or intersect any established road or way, it shall be the duty of the president and directors of said company so to construct said road as not to impede the passage of persons or property along the said highway; and when it shall become necessary to pass through the lands of any individual, it shall be their duty to provide for such individual a proper wagon way across said road from one part of his land to the other; and where said road shall run through the enclosures of individuals, it shall be the duty of said company to dig and keep in repair the necessary stock ditches in order to protect such enclosures."

Section 2 of an act entitled "An act to incorporate the Holly Springs Railroad Company:" "Sec. 2. Be it further enacted, That whenever, in the construction of the said railroad, it shall be necessary to cross or intersect any established road or way, it shall be the duty of the said president and directors so to construct the said railroad across any road already or hereafter to be established by law, as not to impede the passage or transportation of persons or property thereon; and when it shall be necessary to pass through the land of any individual, it shall also be their duty to provide for such individual a proper wagon way across said railroad from one part of his land to another."

By these references it becomes evident that the Chicago, St. Louis & New Orleans Railroad Company was clothed with complete power to do any and all acts which might be necessary to insure the successful maintenance and operation of its line of railroad throughout the state. The object which preceding legislation had in view was the encouragement of various railroad corporations so as to insure the construction of a line of road which should run without break, traversing the entire state, and link together the markets of the north and the fields and factories of the south. This end had already been accomplished at the date of the incorporation of the Chicago, St.

Louis & New Orleans Railroad Company.   The continuous line of railroad was already in successful operation throughout the state, and it was only necessary to clothe the company then coming into existence and obtaining possession of the line with all necessary powers to insure its continued and successful operation.   This company, in assuming charge· and control of the railroad already constructed, was clothed, as successor, with all the powers, privileges,  and franchises with which each and every prior corporation had been by legislative authority invested.   We think it absolutely indisputable that the acts referred to, recognizing and acquiescing in the enjoyment of a franchise by a railroad corporation through the state of Mississippi, and through each one of the municipalities mentioned in its charters and traversed by its line, considered in connection with the further fact that a right of way "from Jackson to Canton," and "from Canton northward," and "through the state," was in express terms granted to the corporations named,  did  do what they undertook to do, and that evidently was to grant and delegate to the Chicago, St. Louis & New Orleans Railroad Company full power to do all acts necessary to the completion of the construction and incidental to the subsequent maintenance of the road, wherever it might, under the terms of its charter, lawfully be laid. *Hazlehurst, Rec., v. Freeman, Trus.,* 52 Ga., 245; *Rio Grande R. R.* v. *Brownsville,* 45 Tex., 88; *M. & E. R. R. Co.* v. *Central R. R. Co.,* 31 N. J. Law, 205, 212; *C. & N. W. Ry. Co.* v. *C. & E. R. R. Co.,* 112 Ill., 589; *Com.* v. *Erie, Etc., R. R. Co.* (Pa.), 67 Am. Dec., 475.

Power, as we have seen, was expressly granted to cross any "public road or way;" and it is now finally and firmly established by the adjudications of our own court and other authorities that these terms refer, unless a contrary intention plainly appears, not only to country highways, but to municipal streets as well.   *Hamline* v. *Railway Co.,* 76 Miss., 417 (25 South., 295); Smith, Mun. Corp., sec. 1495; Elliot, Roads and

Streets, sec. 1, note 3, and cases cited.    To hold that a grant of a right of way through a state did not carry with it the power to cross over highways of every description would be to render nugatory every act of incorporation granted to a railroad company.    In the very nature of things, it would be impracticable, if not impossible, to specify in each act of incorporation every street and road, to be, or which might be, crossed by the projected railroad; and yet it is a matter of common knowledge that no railroad can possibly traverse a populous state without crossing many thoroughfares, both urban and rural.    It was certainly not the intention of the Legislature that the great march of progress in which railroads are so often the leaders could be interfered with or impeded by an arbitrary refusal to grant a right of way by any municipal body.    To so hold would have the inevitable effect of compelling railroad companies not to run through the municipalities of the state, but to avoid them.    That this was not the legislative design, and is not the true view, but is directly violative of the public policy of our state, is plainly shown by all past legislation on this subject; and by reference to section 187 of our present constitution, where it is made compulsory upon every railroad passing within three miles of any county seat, even when not mentioned in its charter, to pass through the same, and to maintain a depot, provided the town or its citizens will grant a right of way and sufficient depot grounds therein; the object clearly being to prevent property values in an established county seat being injured by the locating of a line of railroad a short distance therefrom; and this is an implied recognition on the part of the framers of our constitution of the great underlying truth that railroads, properly conducted and under reasonable regulations, are a power for good in the upbuilding of the material prosperity of a community.

In this state the power of the legislature over municipal streets is plenary, unless in exceptional cases not here presented.

It has the power to divest the municipalities of all control over their streets, and authorize their use by corporations without compensation to the municipality. It is a question of legislative will and intent, not a question of power. *City of Meridian* v. *Telegraph Co.,* 72 Miss., 912 (18 South., 84); Dillon, Mun. Corp., secs. 680, 683, 701; Smith, Mun. Corp., sec. 1309.

With this principle clearly in view, looking now to the facts of this case, and bearing in mind the needs of a railroad for its successful operation, the question next arises as to what rights a railroad acquires in its right of way, and, further, whether there is any difference in the extent of these rights where the right of way is over private property, or where it traverses public streets or highways. It should be borne in mind that both railroad corporations and municipal corporations are created solely by legislative authority, and are clothed, in this connection, at least, only with such powers as are expressly granted in the creative act which vitalizes and brings them into existence. By the grant to a railroad of a right of way, whether that grant be made by legislative act over public lands or across public highways, or by condemnation proceedings, donation, or purchase through private property, certain rights in the use of its right of way are acquired by the railroad. It has the right to do all things with its right of way, within the scope of its charter powers, which may be found essential or incidental to its full and complete use for the purpose for which it was acquired. Thus it has been held that as a railroad cannot be successfully constructed or advantageously operated without establishing proper grades, so that trains may be safely and speedily transported over its tracks, the abutting owner has no claim for compensation for any earth that may be removed from the right of way, or for damages by establishing in a proper manner a grade thereon. *R. R. Co.* v. *Brown,* 64 Miss., 482 (1 South., 637); *Cassidy* v. *Old Colony Ry. Co.,* 141 Mass., 174 (5 N. E., 142). It is also settled that as railroad companies cannot discharge the duties

incumbent upon them as public carriers of freight and passengers, and cannot transport the many trains required by the needs of commerce and travel with safety or security to life or property, without the maintenance of a telegraph system, they have the right to establish a system of wires and posts over their rights of way, and that this is not the imposition of an additional servitude, within the legal meaning of that term, authorizing an abutting owner to claim additional compensation. *American Tel. & Tel. Co.* v. *Pearce,* 71 Md., 541 (18 Atl., 910; 7 L. R. A., 200); *Tel. Co.* v. *Rich,* 19 Kan., 517 (27 Am. Rep., 159); *Taggart* v. *Street Railway Co.,* 16 R. I., 688 (19 Atl., 326; 7 L. R. A., 205); Randolph, Em. Dom., sec. 210. The basic principle here, as in the case of municipal control of highways, is essentially the same. Railroad companies are vested with power to devote the right of way to any purpose within the scope of the original condemnation or acquisition, and for the consequences flowing from such use the original owner is presumed by law to have been fully compensated. They may devote the right of way which they have acquired to any use indispensable to or which will facilitate the fulfillment of the objects of their corporate existence, whether these uses be by grading, constructing of telegraph lines, or other incidental uses requisite for the convenient, safe, and successful conducting of their business and regular running of their trains. Does the use to which the Illinois Central Railroad Company desires to devote its right of way in the instant case fall within the category of incidental uses included within the original condemnation or acquisition, or is it a use foreign to its purpose and outside of its needs? It is hardly necessary to state that as railroad trains are pulled by locomotive engines, and as steam is the propelling power, fuel and water are both absolutely indispensable to their movement. As the power cannot be generated without heat, so water is required in order to bring into existence the required motive energy. If water, then, is necessary, a railroad company

certainly has the right to purchase it, or procure it in any lawful method most convenient, whether by wells dug on its right of way, or by purchase from others. *Hougan* v. *M. & St. P. Ry. Co.,* 35 Iowa, 558 (14 Am. Rep., 502). This much being proven, it follows to our mind, irresistibly, that it has the power to lay such conduits as are required to bring the water from the source of supply to the place of use. It can hardly be seriously contended that a railroad company clothed with power to grade its right of way and to remove the earth therefrom, to lower or raise at pleasure the surface of the ground, and to dig wells for the purpose of obtaining water, would not likewise have the power to dig thereon a trench and lay pipes for the purpose of conveniently conveying the water needed to supply the motive power. We think it manifest, therefore, that if the water main in question was to be laid solely on that portion of the right of way of the railroad obtained by private conveyance or condemnation of private property, the railroad company would be clearly within its rights in so installing it. And we are unable to see that there is any distinction, based upon any sound legal principle, in the power of a railroad company to make such proper use of its right of way as the needs of its business may demand, whether such right of way is acquired through private property by donation, purchase, or condemnation, or granted by legislative enactment over public property, streets, or highways. If it be necessary for a railroad company to construct a telegraph line, or raise or lower a grade where its right of way runs through private property, the same conditions demand the same treatment when the right of way traverses streets or highways. The broad, fundamental principle is: In the construction or maintenance of its line of road, a railroad company is vested with all such powers as may be requisite for the successful consummation of the object for which it was granted corporate existence. Take the instance of an interurban line of cable railway. Should a charter be granted by the state to such a corporation, which, from the

very nature of the power by which the cars are run, requires that a trench shall be dug, and a cable laid over its entire route, could it be successfully contended that the grant of a franchise would not carry with it, even without special provision, the power to perform such work and to dig such trenches as would be indispensable for the construction of its line of road? Clearly not; the reason being that the work is a mere incident to the completion of the purpose for which the charter was granted, and upon which the very existence of the corporation would depend.    Just as a cable is indispensable for the running of such a road, so is water required to produce the propelling power used by steam railroads.    The one is no more necessary to the successful operation of the first than is the latter indispensable to the other.    This being so, and the lessor of the Illinois Central Railroad Company being expressly vested with all requisite powers, privileges, and franchises, and these, in turn, by the broad and general provisions of its lease contract, being transferred to the Illinois Central Railroad Company, and the power of the legislature to grant the franchise being unquestioned, we see no escape from the conclusion that such railroad company is strictly within its rights in laying the proposed water main over its right of way, whether the same traverses private property, or crosses the public streets of a municipality, through which, by legislative enactment, its lessor acquired the right to construct and maintain its line of road. Especially where, as in the instant case, the right to so cross the streets was asserted and exercised by the railroad company long prior to any express legislative grant to the municipality of power to "regulate the crossings of railways," and such use has been acquiesced in and tacitly acknowledged by the municipal authorities and the citizens continuously and uninterruptedly for nearly half a century.    See Smith, Mun. Corp., sec. 1309e; *Chicago* v. *Union, Etc., Co.*, 164 Ill., 224 (45 N. E., 430; 35 L. R. A., 281).    Under these circumstances, the fact that the Illinois Central Railroad Company is a foreign cor-

poration is of no importance. It is not compelled to resort to the power of eminent domain. It is but exercising a right already acquired by its lessor, and to which it has been expressly subrogated.

We do not here decide whether, under sec. 17 of our constitution, the construction across the streets of such water main would or would not entitle the abutting owners on the streets to recover compensation. That is not the case here. The municipality has no such title to the fee of the streets as entitles it to claim compensation from a railroad company or other corporation which by virtue of a legislative franchise occupies a portion of the public streets for crossing. *Meridian* v. *Tel. Co., supra;* Randolph, Em. Dom., secs. 297–365; *People* v. *Kerr,* 27 N. Y., 188.

We recognize the well-established distinction between cases of longitudinal occupancy of streets and cases where the highways are simply crossed in the construction of the line of railroad, but that distinction, as we understand this record, is not brought into question in this case. The only taking of the streets of the city of Canton is by the crossing by the tracks of the railroad, and this power, in our judgment, was expressly granted to the lessor of the Illinois Central Railroad Company, by any just interpretation of the various legislative acts of incorporation hereinbefore referred to.

The remaining question in the case is of easy solution. It is a well-established principle of equity jurisprudence that any unauthorized occupancy of a street constitutes a nuisance, which can by equity be enjoined or prohibited. But here there is no unauthorized occupancy of the public streets of the city of Canton, and no proof that their free use will be permanently interfered with, or that any irreparable damage will be inflicted, and hence there is no ground for the interposition of the restraining hand of a court of equity. *Faust* v. *Pass. Ry. Co.,* 3 Phila., 166; *Danville, Etc., R. R. Co.* v. *Com.,* 73 Pa., 38. Under the facts of this record, all that is sought by the Illinois

Central Railroad Company is the temporary and partial obstruction of the streets for the short time required for the laying of the water main. This it has the right to do, and this power is expressly recognized as a general proposition as appertaining to all railroad corporations by § 3555, Code 1892. For all damages proximately resulting from such laying of the water main and the digging of the trench, the railroad company, by express statutory provision, would be responsible. Elliot, Roads and Streets, secs. 809–882.

*For these reasons, we are of the opinion that the bill of complaint herein states no proper cause for injunction, and, upon the facts disclosed, the decree of the chancellor dissolving the injunction was correct, and is affirmed.*

WHITFIELD, C. J., delivered the following concurring opinion:

The facts in this case necessary to the view I take are these: The Illinois Central Railroad Company, finding a more constant and ready supply of water necessary to the convenient and efficient operation of its railroad as a common carrier, contracted with the Canton Cotton Warehouse Company for such supply. The said railroad company's water station was about 1,700 feet south of the Canton Cotton Warehouse & Ice Factory, and the railroad runs through Canton north and south. The railroad proposed to lay a sub-surface water pipe, within the 100 feet constituting its right of way, from the railroad's water station to a point opposite the ice factory, and from that point to lay pipes on the ice factory's grounds. The channel for the pipes was to be eighteen inches wide by two feet deep. Two of the streets of the city—Peace street and Fulton street—cross the railroad from east to west. Peace street is sixty feet wide, and Fulton street forty feet wide. The Canton Cotton Warehouse Company & Ice Factory and Water Plant is a private corporation. In other words, the waterworks plant does not belong to the city. It was, of course, necessary in

laying this water pipe to cross Peace and Fulton streets.  The
city filed this bill enjoining the laying of this pipe on the
following grounds: First—That the Illinois Central Railroad
Company acquired the right of way, under its lease, through
the charter of the New Orleans, Jackson & Great Northern
Railroad Company, to the town of Canton (that is to say, to
the southern boundary line of the corporation), and that the
right of way north from the Canton corporation line was ac-
quired under the charter of the Mississippi Central Railroad
Company, which charter provided for a right of way north-
ward from the city of Canton.  The contention of the city on
this point was that as the right of way under one charter was
to the city line on the south, and under the other from the city
line north, therefore the railroad had no right of way through
the city.  There are two answers to this: First—The third
section of the charter of the New Orleans, Jackson & Great
Northern Railroad Company, approved March 11, 1852, pro-
vides: "Sec. 3.  Said company is hereby invested with all the
rights and powers necessary for the construction, repair and
maintenance of railroad through this state, and may purchase
such land and material for the same as they may consider
necessary."  The charter of the Holly Springs Railroad Com-
pany, which was made part of the original Mississippi Central
Railroad Company charter, which belonged to the consolidated
company, the Chicago, St. Louis & New Orleans Company, pro-
vides in its eleventh section: "Whenever, in the construction
of the said railroad, it shall be necessary to cross or intersect any
established road or way, it shall be the duty of said president
and directors so to construct said railroad across any road al-
ready, 'or hereafter to be established by law, so as not to im-
pede the passage or transportation of persons or property
thereon; and when it shall be necessary to pass through land
of any individual, it shall also be their duty to provide a
proper wagon way across said railroad from one part of the
land to another."  The right of way through the state of Mis-

sissippi, of course, conferred the power to acquire the right of way through the streets of any city in the state along the charter route. We all agree that there is nothing in this contention. The second ground for the bill was that the laying of this pipe under the surface of the streets was an additional servitude, which the railroad company could not impose without the consent of the city; but it is obvious, from the authorities cited in the brief of counsel for appellee, that this, if so, could only be complained of by an abutting owner, and this bill is filed by the city alone. The rights of no abutting owner are involved here. The third ground for the bill was that there was a corrupt agreement between the Canton Cotton Warehouse Company and the railroad to use the railroad's right of way for a private purpose—that is, to enable the Canton Warehouse Company to sell its water in disregard, as alleged, of the police power of the city over its streets. And complaint is made about the rate at which the water is sold. But the chief ground presented in the argument here was that the railroad company could not cross with its right of way these two streets without the consent of the city, nor lay said water pipes within the right of way without said consent. So far as the right of way is concerned, we have already pointed out that the lessor of the Illinois Central Railroad Company was granted the right of way through and across these streets by charter given by the legislature. Having obtained legislative grant, it was unnecessary to get consent from the city, since the legislative power in that respect is paramount. And secondly, if there had been no legislative grant, there had been forty years' occupation and use of the right of way across these streets, and that conferred a valid prescriptive right. *Louisville* v. *Louisville Water Company,* 105 Ky., 754 (49 S. W., 766), cited in the exhaustive note to *Asher* v. *Hutchinson W., L. & P. Co.* (Kan.), 61 L. R. A., 76.

The only real question in this case for decision is this: Did the grant of the right of way, or the acquisition of the right

of way by forty years' use, confer upon the railroad the right to lay the water pipes set out in the testimony, under the ground forming part of the right of way, where the pipes would run under the streets in question, of the city of Canton? The injunction is based upon the proposition that to permit the railroad to dig up the surface of these two streets crossed transversely by the railroad right of way, so as to lay these pipes underground, beneath the surface of the streets, is an interference with the use of these streets as streets. It is, of course, true that the city of Canton has full power to control its streets and their use by reasonable police regulations. Power of cities in this regard is very large. On the other hand, the railroad company has a right of way over these streets, and the grant of the right of way must carry with it every such use of the incidents of the right of way as will reasonably facilitate the efficient operation of the railroad, which use does not also interfere with the use of the streets by the city as streets for the passage over them by persons riding, driving, or walking, or which does not interfere with their use as streets for other proper purposes, and which use does not also interfere with the property rights of abutting owners. See the authorities collated in note to *Asher* v. *Hutchinson, Etc.,* 61 L. R. A., at pp. 77, 78.

There are some principles which are, of course, plain: First—That the city has the amplest power to control its streets for the good of all its citizens. Second—That the only party who can recover damages of the railroad for putting an additional servitude on these rights of way is the abutting owner. See authorities in brief of counsel for appellee. The city has no right to damages in such case. Third—That the railroad grant of right of way over the streets of the city does not authorize it to interrupt or in any manner interfere with the use of the streets as streets. They may construct any necessary and proper buildings on their right of way. *Gudger* v. *Richmond & Danville R. R. Co.* (N. C.), 43 Am. & Eng. R. R.

Cas., p. 606, and note.    But whether they can lay pipes underneath the surface of streets is not, of course, determined by their right to erect buildings on their right of way, where their right of way does not cross streets.    Fourth—But it is also clear that whatever use of the ground beneath the surface of the streets, essential to the efficient operation of the railway, may be fairly included within the grant of the right of way itself, as incident thereto, is a use to which the railroad company has a right.    Take the concrete case.    What the railroad wants is water.    Railroad trains cannot be operated without water.    The procurement of water in abundant supply is essential, in the highest degree, to the efficient operation of the railroad.    The pipes which are to conduct this water from the property of the Canton Cotton Warehouse to the railroad water tanks are proposed to be put deep beneath the surface of the streets, where the railroad right of way crosses them, and the surface of the streets is to be put back in the same condition in which it is now, so that passage over the streets, as streets, will not be in any manner interfered with. It is true that for the little time required to dig up the surface of the two streets and lay the pipes thereunder—shown to be only a few hours— there would be some slight, temporary, interference with travel over the streets; but it is not this sort of casual, necessary interference which the law means, within the principle which we are discussing.    Such casual, necessary interference, in the prosecution of improvements, may often occur in the adjustment of the relative rights of cities and railroads passing over their streets, and are not to be held by the courts as an insuperable barrier to the development of the manifold needs of the complex civilization of a city, when the relative rights of a city and of common carriers traversing its streets are involved.    The city owes a duty to the railroad, and the railroad a duty to the city. Each must so use its rights as not needlessly to interfere with the exercise by the other of its rights.    The city may and must keep its streets open for travel; but, in doing so, it is not to

stickle at a slight interference for a few hours with that use, when that interference is necessary to enable the railroad to properly exercise its right, incidental to the right of way, to lay sub-surface pipes for the conveying of so essential a thing as water.

As said in *Clark* v. *Fry* (Ohio), 72 Am. Dec., 591: "The right of the public in the use of a highway is the right of transit to every person who has occasion to use it. This right is, however, subject to such incidental and temporary or partial obstructions as manifest necessity may require. Even the use of a highway for mere transit by one part of the public may, at the time of a multitude upon it, oppose a temporary obstruction to the passage of another part of the public. A company of persons stopping and standing on the pavement of a street, or persons stopping in the street with their wagons or carriages, for mere temporary purposes of business, interpose impediments to the free and uninterrupted transit upon a public highway. The delivery of freight and every variety of goods, fuel, etc., at business and other houses on a street, is a necessary incident to the use of the public highway. And the repair or improvement of streets, and the deposit of the materials for the same, often create obstructions to the uninterrupted transit by the public. So, also, the improvement or building or repair of houses and the construction of sewers and cellar drains on adjacent lots often create necessary temporary impediments upon public highways. These are not invasions of, but simply incidents to, or rather qualifications of, the right of transit, and the limitation upon them is that they must not be unnecessarily and unreasonably interposed or prolonged." See, also, *Kirby* v. *Citizens' Ry. Co.* (Md.), 30 Am. St. Rep., 455.

The railroad undertaking to lay such sub-surface pipes transversely and underneath the surface of streets must exercise great care and skill and great dispatch in doing so, so as to make the interference with the use of the surface of the streets as short and as slight as possible. But to hold that,

exercising such care, and reducing the interference to the minimum, as shown in this record, it may not use this right at all, which it has as an incident to its right of way, already lawfully acquired, is to place one's self in the city's point of view wholly, and omit to see the correlative right of the railroad. The use of the streets must be preserved, of course, but the preservation of the use of the streets as streets cannot in any reasonable sense be said to be interfered with by the construction of the sub-surface pipes in the manner indicated by the testimony in this record. The principle is thus announced in *Elyton Land Co.* v. *South & N. A. R. Co.* (Ala.), 10 South., 274: "The authorities support the conclusion that a railroad company may make any use of the land acquired by it for use as the right of way for its railroad which directly or indirectly contributes to the safe, economical, and efficient operation of the road, and which does not interfere with the rights of property pertaining to the adjacent lands." And again at page 273 the court says: "It is a matter of common knowledge that the railroad business involves the use not only of cars and tracks, but of buildings and structures of various kinds. It was contemplated that the strip of land in dispute in this case should be used as a right of way in a city. The place was expected to be the scene for the transaction of many phases of the business different from, but incident to, the mere act of carrying persons or things. It was to be the place for receiving, delivering, storing, and transshipping freight. In such places it is frequently necessary for the convenient transaction of a railroad business to have platforms, warehouses, lumber yards, elevators, cattle pens, engine houses, car sheds, depots, repair shops, and other like facilities contiguous to the tracks. The space which is commonly called the 'railroad right of way' is, in populous localities, generally found dotted with structures, other than the tracks, which are necessary or convenient for the transaction of the business of a common carrier; and we think that the erection of such structures is to be regarded as within

the contemplation of the parties to a contract which stipulates for the use of land in such a locality as a railroad right of way, unless the contrary appears from the terms of the contract.    Ordinarily the right of way of a railroad company is its exclusive property, and the company is entitled to its free and unobstructed use.    *Memphis & C. R. Co.* v. *Womack,* 84 Ala., 149 (4 South., 618).    The company is entitled to an absolute and exclusive possession so far as to secure fully every purpose for which the railroad is made and used.    *Tennessee & C. R. Co.* v. *East Alabama R. Co.,* 75 Ala. 524 (51 Am. St. Rep., 475).    The question is, what are the uses to which the right of way may be devoted?    The Western Railroad Corporation was authorized by its charter to lay out its road, not exceeding five rods wide, through the whole length, and to acquire such strip by condemnation proceedings.    In reference to the rights of the company within this area, Shaw, C. J., delivering the opinion of the supreme court of Massachusetts, said: 'To the extent of five rods, it appears to us, the legislature intended that the franchise of this corporation should extend, for any and all purposes incident to the object of its creation.    It was contended in argument that their franchise for public purposes extended only to the use of this strip of land as a way, and that if they had occasion for buildings and storehouses, as incident to their operations as carriers of persons and merchandise, they were to be regarded, in their latter capacity, as carrying on a distinct business for their own profit, and therefore that such buildings were not to come under the same franchise.    But no such limitation is contained in the act of incorporation, and none such results from the nature of its provisions.    The establishment of the rail track and the maintenance of engines and cars for the transportation of persons and goods are all combined together, as one public object to be attained, and the privileges incident to the other.    No doubt, in practice, the main use of the strip of land of five rods in width, in the greater part of its extent, will be for sustaining the track for the trains to

pass over.  But such restriction of its use is not found in the act, and therefore, when the corporation have occasion to use any part of such strip of five rods for any of the purposes incident to their creation, it is within their franchise.' "  To the same effect, see note to *Gugden* v. *Richmond R.* (N. C.), 43 Am. & Eng. R. R. Cas., 608.  See specially, also, *Allen* v. *Boston,* 159 Mass., 335 (34 N. E., 519; 38 Am. St. Rep., 423). And see, also, *Walker* v. *Pierce,* 38 Vt., 97; *Abbott* v. *Butler,* 59 N. H., 317.

There is a marked distinction between the rights to lay pipes for water, gas, and the like, in a country highway, and in the streets of a city.  The laying of water mains is not an incident of the use of a country highway.  Elliot on Roads and Streets, sec. 404.  But even there Judge Elliot says (p. 415): "If the light is for the highway, and it is necessary to make it safe and convenient for free passage, then it is probable that the highway officers would have a right to dig trenches and lay pipes, for we think it must be the law that where it is necessary to secure gas to light the public way, and thereby make it safe, the highway officers may use the way for a pipe line.  To make our meaning plain, suppose, for example, there is a dangerous bridge or other place in a rural highway much traveled after night, and that the best and most convenient mode of lighting and making it safe is by conveying gas to it, from a place near by; would not the highway officers have a right to dig trenches and lay pipes in the road for the purpose of lighting the dangerous place, and thus make it safe for passage?  To our minds it seems clear that they would have this right."  But the laying of pipes for the water or gas is an incident of the use of the streets in a city.  Says Judge Elliot in sec. 405: "The streets of a city may be used for laying pipe lines, and this is so although there may be no express statutory provision authorizing the municipality to permit such a use.  Where a municipal corporation has power to light its streets or to supply itself with water, it has, as an incidental power, the authority to permit

the necessary pipe lines to be laid in the public streets. But a gas or water company has no right to dig into the streets of a city without the consent of its officers, except, perhaps, in cases where the charter of the company confers that right. Laying water or gas pipes in a street is not an additional burden entitling the owner of the fee to additional compensation. Reservoirs and cisterns may be dug in city streets. Sewers and drains may be constructed in public streets when required for corporate purposes." Precisely the same doctrine is laid down by Judge Dillon in Dillon on Mun. Corp., vol. 2, sec. 697.

The best statement we have seen of the extent of the right of easement in a city of a street is contained in sec. 407 in Elliot on Roads and Streets: "Some of the courts make a distinction between cases in which the fee is in the municipality and those in which it is in the adjoining owner, but, in our judgment, there is, so far, at least, as respects the subject under immediate discussion, no valid reason for the distinction thus declared to exist. The easement which the municipal corporation acquires is broad enough to authorize the corporate officers to make any legitimate use of the streets which does not impair its character as a public way or interfere with its free and unobstructed use. The owner who dedicates ground for a street creates an easement extensive enough to permit the city to make any legitimate public use of it which does not impair the right of passage or the right of ingress and egress to and from adjoining property. So, when the land is taken under the right of eminent domain, all is taken that is necessary to make the street a public way in all that the term implies. The easement acquired is by no means confined to the right of passage or travel, for it is a matter of common knowledge, and therefore of law, that land acquired for a public easement is subject to all the burdens incident to that easement." To the same effect is 15 Am. & Eng. Ency. Law [2d ed.], 497, sec. 5: "As stated above, the municipality has generally no right to place obstructions of a permanent character on a highway for municipal pur-

poses, but temporary obstructions may be permitted for such
purposes when apparently necessary or desirable; and it has
even been held that the municipality may occupy a part of the
highway with a water tank or reservoir to hold water for the
purpose of sprinkling streets." So much for the extent of the
use of the easement of a street. As to the extent to which an
abutting owner may use the easement in the street, it is said in ·
the authority just cited, on p. 497, sec. 6: "It is conceded
that owners of property abutting on the highway may make
certain uses of a part of the highway which are necessary for
the proper utilization and enjoyment of the property. These
rights of the abutting owner are principally those of leaving
building materials and accessories in the highway, and also of
leaving therein, for a reasonable time, articles about to be
moved from or into a building, and apparatus or vehicles for
the purpose of aiding in such removal, and a wagon may be
placed on the sidewalk for this purpose. The obstruction by
the abutting owner must, however, be of a reasonably neces-
sary character, and it must not unreasonably interfere with the
rights of the public to use the highway." The same au-
thority states in note 5 on the same page: "A railroad com-
pany improving land adjoining a highway for railroad pur-
poses has the same right as an abutting owner to utilize a part
of the highway for the purpose of construction work." The
same authority, on p. 500, par. "h," states: "The unau-
thorized making in or near the highway of an excavation which
is calculated to interfere with travel constitutes an obstruction
and nuisance, subjecting the maker to liability in damages in
case any person is injured thereby, unless it is necessarily made
in the improvement of abutting property, in which case it must
not be unnecessarily extended or continued, and must be prop-
erly guarded to prevent accidents." And on p. 491, par. 14,
it states: "While highways are primarily designed for the pur-
pose of travel, and must therefore be kept clear of obstructions,
the law justifies obstructions of a partial and temporary char-

acter, from the necessity of the case, and for the convenience of mankind, when those obstructions occur in the customary or contemplated use of the highway; they being reasonably necessary and not unduly prolonged. As to what is a proper obstruction, as being based on a reasonable and necessary use, it is impossible to lay down any general rule; each case being determinable by the particular circumstances thereof." To the same effect, see *Allen* v. *Boston,* 159 Mass., 335 (34 N. E., 519; 38 Am. St. Rep., 423). In 43 Am. & Eng. R. R. Cas., 576, in a note to *Calcasieu Lumber Co.* v. *Harris* (Tex. Sup.), the supreme court of Kansas is quoted as saying in *Kan. Cent. R. Co.* v. *Allen,* 22 Kan., 285 (31 Am. St. Rep., 190): "An easement merely gives a railroad company a right of way in the land— that is, the right to use the land for its purposes. This includes the right to employ the land taken for the purposes of constructing, maintaining, and operating a railroad thereon. Under this right the company has the free and perfect use of the surface of the land as far as necessary for all its purposes, and the right to use as much above and below the surface as may be needed."

Now, what is the principle underlying the right of the city to lay pipes in the streets for water and gas for the public good, and the right of the abutting owner likewise to make excavations under the streets wherein to lay pipes for sewage or water? Manifestly the principle is that land dedicated for a street is not limited as a highway to the one purpose of passage over its surface by pedestrians, vehicles, street cars, etc., but that the easement of streets is so extensive as to permit any other use by the city or by the abutting owner which does not interfere with the use of the street as a highway for travel. It may be conceded that the primary use of a street is that it may be used for travel over its surface, but that in no way interferes with the sweep of the principle that it may also be used for any other purpose not foreign to its use as a highway which does not materially interfere with such use of it as a

highway. It is impossible to conjecture at the time of the dedicating of any given street in a city how varied and how numerous may be the other uses referred to, demanded by the complex needs of an advancing civilization in city life. Now, on this same principle, precisely, the railroad in this case is entitled to passage over the surface of the streets, and to any other use—sub-surface or super-surface—of the land embraced in its right of way which contributes essentially to the efficient operation of its road as a carrier of freight and passengers, provided only that such other use does not interfere with the use of the streets as streets.

It is said that the Illinois Central Railroad Company is but the lessee ·of the railroad which constructs these railroad crossings over the streets of Canton, and authorities are cited announcing the familiar principle that ordinarily in such cases the lessee company cannot exercise the right of eminent domain itself, because it does not belong to it by the lease; but those authorities have no application whatever here, for the very obvious reason that the lessor railroad company acquired the right of way itself in the exercise of the right of eminent domain, and the right of way the lessor railroad acquired, of course, passed, in the full extent it had it .when so acquired, to the lessee. The appellee is not claiming the right to exercise the right of eminent domain in laying these pipes. Precisely what it claims—and nothing more—is that the right of way acquired by its lessor, and which passed by the lease to it, embraced, as a necessary incident, the right to lay these pipes. Appellee insists that the lessor railroad company could have laid these pipes, as being necessary to the convenient and efficient operation of its railway, and that by its lease it got that right thus already existing in the lessor. In other words, as said at the outset, the crucial test is, what exactly is embraced, under the facts of this case, in the right of way which the lessor had, and, of course, conveyed to the lessee? Cannot it be fairly said that the laying of these pipes within the right of

way originally acquired by the lessor materially facilitates and efficiently aids the operation of the railroad company as a freight and passenger carrier? If so, then it was an incident to that right of way. The railroad is interfering in no proper sense with any existing use of these streets. If in time the city should need to put pipes for water or gas or sewage under these same streets at these points, when that time arrives there must be a readjustment to suit the needs of the changed conditions. No such situation is presented by this record.

We have already adverted to the fact that no abutting owner is here complaining upon the ground that a new servitude is being imposed by the railroad company on the right of way. If such abutting owner should complain, and if he should show that the laying of these pipes is the imposition of a new servitude, he, of course, could recover such damages as may be occasioned to him thereby, but that is not our case.

We have paid no attention to the charge of collusion between the railroad and the cotton warehouse, for it must be obvious that, if the railroad had the legal right to lay these pipes, the laying of them could not be rendered illegal because of any collusive agreement between it and the cotton warehouse that the railroad should lay them. What it is legal to do cannot be rendered illegal because of a foolish collusive agreement to do it.

*Careful consideration of the case leads us to the conclusion that the action of the learned chancellor is correct, and the decree is affirmed.*

CALHOON, J., delivered the following dissenting opinion:

The railroad tracks through the city of Canton and over its streets have been there more than forty years, and there has never been, and is not now, any trouble about a supply of water, of which there is plenty, nor any effort by the Illinois Central Railroad Company, until now, or by any of its predecessors, to excavate the public streets of the city to lay pipes

in order to get water by purchase from another corporation or individual. Its position here is that it has the state's power, which has no need to say to a city, "By your leave," when it proceeds to dig up its streets and throw ditches at right angles across them. This proposition calls for examination to see whether, as a matter of reason or law, this foreign corporation, organized and existing under the laws of the state of Illinois, does not have to say, "By your leave." Every citizen or domestic corporation has to say it before excavating a public street. A request for such specific power would no doubt be hooted out of any legislature in the Union. No corporation, foreign or domestic, it may be assumed, has ever had the hardihood to ask the grant of such specific power under the circumstances shown in this record. Even grants of rights of necessary surface construction over highways are always, everywhere, most carefully guarded. Code 1892, § § 2931, 2974, 3555. Here the claim is under power implied, not express. No citizen may defy the municipal government in its full police power over its streets—a power necessarily inherent in such governments, and always and everywhere recognized by the courts. Then, clearly, before a foreign or domestic corporation can so act, it must be armed with a very plain legislative grant. Without creation by the people, private corporations are nothing. Without it they are more powerless than the humblest inhabitant. Without it a bacillus is a monarch in comparison The people have said to them: "Your charter from us is your law, and you shall do nothing without our warrant upon a strict construction of the powers we grant." The appellee railroad company must concede all this; must concede that the municipal government, elected by its people, has, subordinately to legislative action, the exclusive police power over its streets; must grant that, for the convenience and safety of citizens, who must go about on foot, on horseback, and in wagons, there can be no more important police power intrusted to the government they elect; must grant that not one of these citizens

may lawfully dig up the streets.   But they say, "We may, and we will, without saying, 'By your leave,' to the city authorities."   And why?   "Because," they say, "the power in us to do this is necessarily implied as incidental to express powers given to our remotest predecessor by the state legislature."  Curious that a legislature, which is the sovereign people, sitting as lawmakers in a pure democracy, should give you power to dig up streets at your pleasure, without authority from, and in defiance of, the local government which they themselves have armed with exclusive jurisdiction over streets, and without even consulting the authorities.   Curious that they should equip you with a *supra* jurisdictional force which the foremost citizen could not exercise without punishment by fine or imprisonment or both. · Still more curious that they should design this power to be inferred by implication.

Recognizing the necessity of showing credentials for the very unnecessary proceeding they want to put in operation, they produce two certain sections of charters given their remotest predecessors fifty years ago.   One is this: "Sec. 3.   Said company is hereby invested with all the rights and powers necessary for the construction, repair, and maintenance of a railroad through this state, and may purchase such land and material for the same as they may consider necessary."   This case, in one branch of it, turns on the scope of the word "necessary."  How a necessarily incidental power can be deduced from this to dig across three public streets, in defiance of municipal protest, in order to get cheaper water from another corporation, which could not so dig, is beyond my power to take in.   No case is produced to support such view.   Being doubtful about the sufficiency of this, they produce another section, in these words: "Sec. 2.   Whenever in the construction of said railroad it shall be necessary to cross or intersect any established road or way, it shall be the duty of said president and directors so to construct said railroad across any road, already or hereafter to be established by law, so as not to impede the passage

or transportation of persons or property thereon; and when it shall be necessary to pass through the land of any individual, it shall also be their duty to provide a proper wagon way across said railroad from one part of the land to another." If this means anything, it limits and confines the railroad to surface work over roads, and certainly does not squint at the power to excavate to lay water mains in public streets. By no construction of this charter by any rule known to me, or sanctioned by any known decision, can be deduced an incidental authority to excavate the streets of a city, forty years after construction, for gain. Such a conclusion, to my mind, makes it follow, "as the night the day," that they may dig a cistern in the street, and connect with it by sub-surface pipes. My associates must agree that it does follow that, if Canton were a Chicago or Washington City, the company may dig into and across a dozen asphalt boulevard streets to get not merely water, but cheaper water. In my view, the bare statement of the proposition overthrows it. But this sec. 2 has no bearing whatever on the question here. It relates to construction only and over roads. Neither section, on any right reasoning, can be construed to refer to any power, after construction, to dig into streets, without the police supervision of the city, for water, after forty years of use of the constructed railroad, when the water is not "necessary." Here it is not pretended to be necessary. Sec. 3, *supra,* confers only "rights and powers necessary for the construction, repair, and maintenance of a railroad through this state," etc. "Necessary" means what must be—that is, unavoidable; not merely convenient or advantageous. True, the courts give a somewhat liberal interpretation to the word "necessary" in considering grants of powers, even to corporations, but there is no instance known to me, or adduced, which sustains the claim of the foreign railroad company here. It is not conceivable that the legislature intended to grant by sec. 3 any such power as is here claimed, which power has not been found necessary for nearly fifty years to the "main-

tenance" of the railroad, and cannot be, and is not now said to be.

Illustrating the settled doctrine of non-extension by implication of the powers of corporations, see *Downing* v. *Mt. Washington,* 40 N. H., 230; *Macon* v. *R. R. Co.,* 7 Ga., 221; *R. R. Co.* v. *Briggs,* 22 N. J. Law, 623; *Perrine* v. *Chesapeake,* 9 How., 184 (13 L. ed., 92); *Ford* v. *Delta Pine Land Co.,* 164 U. S., 662 (17 Sup. Ct., 230; 41 L. ed., 590); Rorer on Railroads, 36; 1 Elliot on Railroads, p. 56; *Ry. Co.* v. *Morris,* 67 Tex., 700 (4 S. W., 156); *State* v. *Beck,* 81 Ind., 500.

But they say here the work can be done in a few hours—that it is such a little thing. However, the principle is very large. They say, too, that by this undermining of three public streets they can get water cheaper than from the city which owns its own water plant. So it seems they want a strained and unnatural construction of their charter, not merely to get water, of which there is a great abundance, but to get it cheaper than private citizens can. They want a lighter burden than the common people have to bear. Was this monstrosity ever contemplated by any legislature of any free people in the world?

The fact disclosed is that the Canton Warehouse Company had contracted itself to do the digging and piping and to furnish water to the Illinois Central Railroad Company. But astute counsel seeing that the former could not dig streets to sell its water, an immediate arrangement was made in reliance on a forced construction of the railroad charter, and as a result we have what, in my opinion, is the first instance in the recorded history of railroads where such an outrage as this record discloses was ever attempted on the government of the free people of any city.

The authorities cited for appellee have, in my judgment, no remote bearing on the question, except that by inference they support my position. Of course the company may dig wells on the right of way, and erect structures and telegraph poles on it, not in streets; but the plain implication is they may

not do it to impede or obstruct ways of. public passage, and the authorities so differentiate. I regard the case in hand, in the principle it involves, as quite grave, and there can be no difference of opinion that a great corporation presents itself in very questionable shape in this record, whether right or wrong on the law.

If we are to consider, as we should (and as my associates must agree that we should), the municipal chapter of the code as of force, or as being a declaration of the public policy of the state, and as a recognition of the common law of all time applicable to the subjects now in hand, then there is another serious feature of this record to be. adverted to. In this view, the opinion of the majority of the court, in my judgment, is a judicial repeal of the spirit and letter of important independent clauses of five sections of Code 1892—viz., § § 2933, 2947, 2948, and 2974. The record shows that these sections were adopted by ordinance of the city long before this litigation arose. Sec. 2947 gives the municipal boards "full jurisdiction in the matter of streets," etc. Sec. 2931 empowers them to "regulate the construction and passage of railways and street railroads through the streets," etc. Sec. 2933 empowers them "to grant to any person or corporation the use of the streets," etc., "to lay gas, water, sewer, or steam pipes, etc., to be used in furnishing . . . any person or corporation with water," etc. Sec. 2948 empowers them to "prescribe the rates for the sale of water." Sec. 2974 empowers them "to regulate the crossing of railways . . . and provide precautions and prescribe rules regulating the same," etc. "Full jurisdiction" means "exclusive jurisdiction," as has been repeatedly held by this court, and so held as to sec. 2947 in the case of *Blocker* v. *State,* 72 Miss., 723 (18 South., 388). As may be gathered from what has been said, I favor the doctrine of strict construction of charters, and I stand opposed to the exercise of doubtful powers. But on the most liberal construction of powers under the charter of the railroad now sought to be exer-

cised, by a lessee which claims to be a foreign railroad cor-
poration, it seems certain that it cannot exercise them except
according to law, and it seems certain that it cannot exercise
them in palpable violation of law.    Surely it cannot dig
through three streets at right angles without calling on the city
"to provide precautions" in the work, in the language of
§ 2974, Code 1892.   The city government, with "full juris-
diction" over streets, with exclusive jurisdiction to "regulate
the construction and passage of railways through the streets,"
with exclusive jurisdiction to grant the power to any "person
or corporation" to "use the streets to lay water pipes," with
exclusive jurisdiction to "prescribe the rates" for the sale
of water (Code 1892, § 2948), with exclusive jurisdiction to
"provide precautions" in the crossing of streets by railways, is
entitled to a decree in this cause.   The city must be consulted
by "any person or corporation," under Code 1892, § 2933,
whether claiming the right under charter or not, before laying
water pipes in the street.   This is reasonable, and none ought
to contend that a charter power may be exercised unreasonably
and independently of the prescribed law of supervision as
set forth in that section.   All those provisions are simply
enactments of the common law universally recognized by the
authorities and text-books relating to the subject.   Franchises
are granted by legislatures to their immediate creatures, and
cannot be leased to either foreign or domestic corporations ex-
cept by express authority.   In the act authorizing the lease of
the Illinois Central Railroad Company (Laws 1882, pp. 1023,
1024, ch. 559, sec. 2) there is absolutely no such authority given
as is here claimed.   It seems to have been carefully omitted.
Under it the "railroad" only may be leased.   So well did the
great lawyers who represented this foreign corporation under-
stand this that they provided in the very first clause of the
four-hundred-years lease itself that the lease was of specified
things—viz., "all and singular the railroad of the party of
the first part, extending," etc. (describing it), "and also the

lands, gravel pits, rock quarries, rights of way, depot buildings, and depot grounds, station houses and station grounds, water tanks, machine shops, workshops, stationary engines, machinery and fixtures, engine houses, warehouses, offices, and all other buildings, structures, and improvements of any nature and kind whatsoever." And so well did those lawyers comprehend that they were on a "shaking prairie" that they provided in the second clause of the lease that the Chicago, St. Louis & New Orleans Railroad Company, the immediate lessor, should "maintain its corporate organization and existence by the annual election of directors and officers, and the performance of such other acts as may be required by law for that purpose, and that it will at any time during the said term [four hundred years], when requested by the said party of the second part [the appellee], its successors or assigns, exercise every corporate power, and do every corporate act which the party of the first part [the lessor] can lawfully exercise or do," etc. So there was no authority in law to lease any franchise, and in fact no franchise, but only specified things, appear in the contract of lease; and there can be no warrant for the bald and palpable fraud here attempted by a foreign corporation on our constitution (secs. 179–190) by the attempted exercise of pretended rights in flagrant violation of law, and never sought to be exercised for fifty years by its predecessors or by any other railroad company on earth at any time. In the exercise of these asserted rights, it may, under the decision in this case, as my brethren must admit, at any time, rip up the vitrified brick pavement in the capital city of the state, and lay water pipes under it, to do what? Not to get necessary water, but to get water cheaper than any inhabitant of Jackson can get it. I respectfully repudiate this, and more especially, if further emphasis were needed, when the record unmistakably shows that this foreign corporation relies absolutely on an agreement with a private corporation of this state, the Canton Cotton Warehouse Company, to enable it to do

what the warehouse company could not do, and for the exe-
cution of which the home company might be dealt with by the
city.   If illegal in the warehouse company to lay the pipes
to furnish the water, the agreement is clearly illegal as to
both parties to it.   There is no question here of the rights of
abutting owners, to which appellees attempt to confine this case.
It is a question of governmental police power, which cannot be
bargained away and which "shall never be abridged."   Const.,
sec. 190.   If any right exists in any railroad corporation, which
I deny, to commit the inexcusable outrage attempted here by
the Illinois Central Railroad Company, it could be claimed
only by its lessor, the Chicago, St. Louis & New Orleans Com-
pany, which is not even a party to this litigation.   This alone
is fatal to the claim of the Illinois Central Railroad Company.
19 Am. & Eng. Ency. Law, 899, and note; *Englewood* v. *R. R.,*
117 Ill., 611 (6 N. E., 684); *Dietrichs* v. *Lincoln, Etc., Co.,*
13 Neb., 361 (13 N. W., 624); *Gottschalk* v. *Lincoln, Etc.,*
*Co.,* 14 Neb., 389 (15 N. W., 695); *Kip* v. *N. Y.,* 67 N. Y.,
227; 1 Elliot on Railroads, sec. 37; 1 Rorer on Railroads, p.
36.   Even "the right to place rails upon a road or street, and
use it in the operation of a railroad, can only be granted ex-
pressly or by necessary implication, and the use must be rea-
sonable, and such as was clearly contemplated."   3 Elliot on
Railroads, sec. 1076, and the authorities it cites in note 1,
p. 1613.   In *Edmonds* v. *Baltimore, Etc.,* 114 U. S., 461
(5 Sup. Ct., 1100; 29 L. ed., 216), it is said: "It is not known
to any member of this court that any railroad company has
ever claimed to use the streets of an incorporated city, or any
part of them, without express authority from some legislative
body."   Where is any express authority in this record?   No-
where.

    To my mind it is manifest: (1) That the New Orleans,
Jackson & Great Northern Railroad Company, if it were now
operating this road, could not, under its charter of 1852, con-
taining the clause relied on, do the act sought to be done here.

Repeating that clause, it reads as follows: "That said company are hereby invested with all rights and powers necessary for the construction, repair, and maintenance of said railroad through this state." Is it reasonable to suppose that the legislature, in the language used, even if it were used now at this date, had any contemplation of conferring power to undermine the streets of a city? Water mains for the sale of water were unknown here in 1852. (2) If the power exists, it can only be exercised when necessary, and it is not necessary under the facts of this case. If not regarded necessary for fifty years, why is it so now? (3) If necessary now, it is still the exercise of a franchise which cannot be availed of by the lessee, and the lessor is not a party. The act of 1882 does not authorize the lease of any franchise. (4) The warehouse company being without power, the railroad company will not be allowed to combine with it to evade the law.

The questions here are very important, and, while railroad corporations are quite useful, and should be fully protected in their charter rights, still, when they begin gross usurpations, they should be promptly restrained by the strong hand of lawful authority. It is settled law that charters must be construed favorably to the rights of the public, and most strongly against the corporations claiming under them. The authorities seem to be uniform that neither states nor municipalities can strip themselves of their police powers by any contract whatever, because such powers are absolutely essential to the well-being of society, if not the actual existence of the social order. I do not think they should be impaired by a liberal, if not loose, interpretation of the word "necessary" in its collocation in the charter in hand, under the facts disclosed by this record. A fair test is this: If accident and injury occurred because of the trench proposed to be dug, could the city shelter itself from liability in damages under the sections of the charter of the railroad company hereinbefore quoted? Would any court orig-

inally so hold? I think not. If not, it follows irresistibly that this case should be reversed.

It seems to me unnecessary to refer to that line of authorities, clearly sound, holding that parts of the streets may, of necessity, be temporarily obstructed by corporations or individuals with building materials, where structures are being erected on private property or the right of way. The differentiation is too manifest to require pointing out.

The direct violation of the sections of the code referred to is indisputable, in my judgment, and this cannot be argued away, unless on the postulate that a government may contract away its police power, so vital to the people, and that it has in this instance contracted it away through the enactment of a legislature binding on its successors. This position, in reference to police power, is not supported by any precedent.